**BRINKLEY v. HASSIG et al.**

No. 1344.

Circuit Court of Appeals, Tenth Circuit.

April 7, 1936.

James H. Harkless, of Kansas City, Mo., and James E. Smith, of Topeka, Kan. (John S. Dean, E. H. Hatcher, Frank H. McFarland, and Schuyler W. Jackson, all of Topeka, Kan., on the brief), for appellant.

William C. Ralston, Sp. Asst. Atty. Gen., and Ralph T. O'Neil, of Topeka, Kan. (Clarence V. Beck, Atty. Gen., John G. Egan, Asst. Atty. Gen., and John D. M. Hamilton and Barton E. Griffith, both of Topeka, Kan., on the brief), for appellees.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

## McDERMOTT, Circuit Judge.

On September 17, 1930, the Kansas State Medical Board revoked the license of Dr. John R. Brinkley to practice medicine and surgery in the state of Kansas. On December 30, 1931, this action was brought to set aside and enjoin such order on the ground that it invaded rights guaranteed by the Federal Constitution. The trial court, after a long trial, dismissed the bill on its merits on July 15, 1935. This is an appeal from that order.

The Kansas statute, 1933 Supp. to R.S. 1923, 74—1001, establishes a board of medical registration and examination consisting of seven physicians in good standing. Id., 65—1001, provides in part:

"The board may refuse to grant a certificate to any person guilty of felony or gross immorality or addicted to the liquor or drug habit to such a degree as to render him unfit to practice medicine or surgery, and may, after notice and hearing, revoke the certificate for like cause, or for malpractice or unprofessional conduct."

On April 28, 1930, a complaint based on eleven specific charges of fraud, immorality, and unprofessional conduct was filed before the board praying for the revocation of appellant's license. If any one of them is sufficient in law and supported by substantial evidence, it will sustain the order. One charge is that appellant performs a "compound operation" on patients for the purpose of curing impotency, high blood pressure, epilepsy, dementia praecox, and diseases of the prostate gland and kidneys; that he accomplishes these cures by transplanting animal or human glands into the patient; that the charge for goat glands is $750 and for human glands $5,000; that such operation is of no value to the patient.

Another charge is that he gives talks over the radio "for the purpose of enticing patients to his hospital and to induce persons to purchase medicines; that he diagnoses and prescribes for patients over the radio; that he gives prescriptions by numbers which have to be filled by and purchased at certain drug stores, from which he obtains a commission; * * * that such diagnosing and prescribing by radio are necessarily inaccurate and dangerous, carrying too great a hazard of error in misinterpretation of symptoms, inaccuracy of patients' statements of the location and character of complaints, the risk of misunderstanding the respondent's directions and confusion of numbers given of prescriptions, and lacking entirely in the information to be gained by the usual ordinary routine physical and laboratory examination of the patients, without doing which respondent is grossly negligent."

Appellant was given notice of the charges and of the hearing thereon. After motions to strike from the complaint and to make it more definite and certain were denied, an answer was filed; the issues so joined came on for hearing July 15, 1930. The hearing, with some adjournments, lasted until September 16 and included a session at which appellant performed the compound operation in the presence of the board. The evidence of hundreds of witnesses was received, much of it highly technical. Throughout appellant was represented by counsel who had acquired a comprehensive knowledge of the anatomy involved.

If we translate the medical terms used with reasonable accuracy, the first two phases of the compound operation are routine minor surgery; the first is injecting mercurochrome into the seminal vesicles, and the second is an ordinary vasectomy. The first is useful where there is infection and the second where sterility is desired. But, excepting appellant, the doctors testified that such phases could have no effect on the diseases for which appellant advertised the operation as a palliative.

The third phase was advertised by appellant in part as follows:

"Likewise we borrow the services of a branch artery, and this is delicately anastomosed down alongside the vas into the epididymis."

Many surgeons testified that this phase was a physical impossibility. However, it does appear that appellant did pick up a loose areolar or fascial tissue from the scrotum and implanted it in the testicle. So this argument turns on the meaning of the word "anastomosis" and is not important. The surgeons generally testified that the implantation made was useless.

The fourth phase is the transplantation of the testicle of a goat into the scrotum of a man. Many eminent surgeons testified that such transplantation could not be of the slightest benefit to the patient. Others, including the Drs. Mayo and Judd, testified that results so far attained in experimental gland transplantation have not met with sufficient success to justify adoption in clinical surgery. Appellant maintained its efficacy and brought onto the record the experiments of others along this line; more than four hundred patients testified they had been materially benefited by the operation and were more than satisfied.

There was also evidence that the operation was distinctly a minor one, performed under a local anaesthetic, and if it had been of value, should not cost more than $100. There was also evidence that, as performed, it was not aseptic.

The Legislature enacted that membership of this board should be confined to physicians and surgeons because they alone have the education and experience to determine such questions as are here presented. Does this record disclose no more than a conflict of opinion among reputable surgeons as to the technique of operative procedure, or as to when it is indicated? Or does it disclose that appellant was using his license to perpetrate a cruel hoax upon the public by exacting extravagant fees for a trivial and worthless operation? Did appellant endanger the health of his patients by seducing them into the belief that serious diseases could be cured by a surgical hocus-pocus? Whether it is the one or the other is a question peculiarly for the decision of men skilled in anatomy. There is a great volume of evidence in this record to support the latter conclusion; and if such is

the fact, the board would have been derelict if appellant's license had not been revoked. It is true, as counsel argue, that the great advances in medical science have come about by the courage of pioneers, whose efforts often met with ridicule from their professional brethren. It is true that doctors even yet disagree. It is also true that charlatans masquerading as doctors defraud the public to their own enrichment by promising to cure cancer with innocuous ointments, and thus endanger the lives of their patients by depriving them of sound medical advice. Between these two extremes there is a twilight zone where doubts might perplex. But unless we can say, from the record, that there is no doubt that this is a mere disagreement among doctors, the finding of the board is not open to our review. The Legislature has properly committed the vital question of the fitness of those who administer to the sick to a skilled board of medical men, and not to courts unlearned in the art. The proof here amply supports the conclusion that the compound operation is not an honest effort to relieve the suffering, but a scheme for appellant's unjust enrichment.

The proof as to the diagnosis of disease and prescriptions for its cure over the radio is too long to relate and is undisputed, there being an unchallenged stenographic report of some of the broadcasts. Enough to say that through regular broadcasts appellant diagnosed almost every ailment the human flesh is heir to; sometimes he told his patients to consult a doctor; much more often he prescribed remedies by numbers which could be obtained from drug stores throughout the middle west to whom he had furnished the prescriptions, and from whom he received a part of the price of some of the prescriptions. These diagnoses were made without an examination of the patient, and upon only such symptoms as the patient would give in a letter or telegram. One patient sent in an X-ray picture; appellant said, "I can't make much out of it"; nevertheless he diagnosed and prescribed. Another telegraphed she had a pain around her heart; he diagnosed it promptly as a kidney involvement and prescribed a diet and three prescriptions. Another wrote that he or she had a pain in the right side; appellant diagnosed it as "probably gall bladder" and prescribed one remedy "if you are a man" and another "if you are a lady." And so on and on.

One need not be skilled in medicine to understand the grave dangers to human life involved in diagnosis and prescription on such sketchy facts as are obtainable from a letter or a telegram; nor of the danger to thousands of others listening in who apply such advice to their own self-diagnosed diseases. It is no answer to suggest that the prescriptions are harmless in themselves; to prescribe bread pills to a diabetic whom insulin might save is to trifle with human life. The Court of Appeals of the District of Columbia passed upon the same question in KFKB Broadcasting Ass'n v. Federal Radio Commission, 60 App.D.C. 79, 47 F.(2d) 670, 672; in sustaining an order denying a renewal of the license of appellant's radio station, that court sustained the commission's finding that appellant's radio diagnosis "is inimical to the public health and safety, and for that reason is not in the public interest." The trial court aptly said:

"Those methods are not only in conflict with the ethics of the profession but are in my opinion in conflict with the best interests of the public, and that irrespective of the value of the operations performed by him at the hospital for the amelioration of the prostate gland or of the benefits to individuals using prescriptions given through radio broadcasting, the possibilities of injury to the general public resulting from such methods are so apparent if such practice became general and usual that its mere statement is, I think, sufficient."

It is argued that reputable doctors prescribe over the telephone. It is one thing for a family physician, knowing his patient as well as he knows himself, to prescribe for some simple or prevalent ailment over the phone, and quite another to prescribe for the unknown ailments of total strangers over the radio. It is argued that newspapers operate medical question boxes and medical columns. Those which have fallen under our observation prescribe simple and well-known remedies for definite and minor ailments. If such newspapers purport to diagnose and prescribe for serious and obscure diseases, they ought to be suppressed. It is no answer for one wrongdoer to point to another. Again, on one extreme is advice to keep your feet dry and to take a physic if you have a cold, and another to diagnose kidney trouble from a telegram saying there is a pain around the heart. It is for men trained in medicine instead of law to determine on which side of the line a particular case may fall. It was for the board to determine, within the limits of reason, what constitutes "unprofessional conduct." That unprofessional conduct as so determined is also condemned by the American Medical Association does not vitiate the order. The board has determined that appellant's acts constitute unprofessional conduct. There is substantial evidence to support its finding. There is nothing to support the assertion that such finding is arbitrary or capricious. On the contrary, the weight of the evidence required the finding. The trial court has approved and we agree.

■ It appears then that the statute authorizes the revocation of a license for unprofessional conduct; that appellant was given ample notice of charges of such conduct and afforded an exhaustive hearing thereon; that there was overwhelming evidence to support the charges, the evidence being undisputed as to the most serious breach of professional conduct, diagnosing and prescribing without adequate information. It thus appears that appellant's license was rightly subject to revocation. With this background, we turn to the specific attacks upon the order.

■ The power of the state to protect its citizens against imposition by those purporting to practice the learned professions has been sustained without dissent for many generations. Nearly forty years ago Mr. Justice Brewer, speaking for the Supreme Court of the United States in Hawker v. New York, 170 U.S. 189, 194, 195, 18 S.Ct. 573, 575, 42 L.Ed. 1002, used or adopted this language:

"The physician is one whose relations to life and health are of the most intimate character. It is fitting, not merely that he should possess a knowledge of diseases and their remedies, but also that he should be one who may safely be trusted to apply those remedies. Character is as important a qualification as knowledge, and if the legislature may properly require a definite course of instruction, or a certain examination as to learning, it may with equal propriety prescribe what evidence of good character shall be furnished. * * * 'The legislature, then, in the interest of society, and to prevent the imposition of quacks, adventurers, and charlatans upon the ignorant and credulous, has the power to prescribe the qualifications of those

whom the state permits to practice medicine.' * * * 'It is, no one can doubt, of high importance to the community that health, limb, and life should not be left to the treatment of ignorant pretenders and charlatans. It is within the power of the legislature to enact such laws as will protect the people from ignorant pretenders, and secure them the services of reputable, skilled, and learned men.'"

In March, 1935, Mr. Chief Justice Hughes, for the same court, held that a state board had the power to find a dentist guilty of unprofessional conduct who had extravagantly advertised his professional abilities; and in closing that opinion used this language entirely apposite here:

"We do not doubt the authority of the state to estimate the baleful effects of such methods and to put a stop to them. The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of the market place. The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. And the community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous. What is generally called the 'ethics' of the profession is but the consensus of expert opinion as to the necessity of such standards." Semler v. Ore. State Board of Dental Examiners, 294 U.S. 608, 612, 55 S.Ct. 570, 572, 79 L.Ed. 1086.

Authorities to the same general effect may be gathered almost without number. A few may be found in the note.[1]

The Kansas statute has been sustained by the Supreme Court of the United States in this particular proceeding. Shortly after appellant was noticed of the hearing upon the charges preferred he brought an action in the state court to enjoin the hearing. The trial court dismissed his petition upon demurrer. The Supreme Court of Kansas affirmed. Brinkley v. Hassig, 130 Kan. 874, 289 P. 64, 65. Appeal was taken to the Supreme Court of the United States. The appeal was dismissed because no substantial federal question was presented, the court citing in support its earlier decision on the Kansas statute in the Meffert Case, supra, and its decision in State of Mo. ex rel. Hurwitz v. North, supra, sustaining similar proceedings under the Missouri statute. Brinkley v. Hassig, 282 U.S. 800, 51 S.Ct. 39, 75 L.Ed. 720.

The parties being the same there as here, appellant is not entitled to a re-examination of issues there decided, both on the principle of res judicata[2] and because we are bound by the decisions of the Supreme Court of the United States. The points so foreclosed are: (1) The statute is constitutional notwithstanding the general language used in specifying grounds for revocation. (2) The complaint stated grounds for revocation under the statute, the Supreme Court construing it as follows:

"The complaint was by no means confined to challenge of the success of the li-

[1] Roschen v. Ward, 279 U.S. 337, 49 S. Ct. 336, 73 L.Ed. 722; Graves v. Minnesota, 272 U.S. 425, 47 S.Ct. 122, 71 L. Ed. 331; State of Mo. ex rel. Hurwitz v. North, 271 U.S. 40, 46 S.Ct. 384, 70 L. Ed. 818 (where the board had no power to issue subpœnas); Douglas v. Noble, 261 U.S. 165, 43 S.Ct. 303, 67 L.Ed. 590; Crane v. Johnson, 242 U.S. 339, 37 S.Ct. 176, 61 L.Ed. 348, Ann.Cas.1917B, 796; McNaughton v. Johnson, 242 U.S. 344, 37 S.Ct. 178, 61 L.Ed. 352, Ann.Cas.1917B, 801; Collins v. Texas, 223 U.S. 288, 32 S. Ct. 286, 56 L.Ed. 439; Reetz v. Michigan, 188 U.S. 505, 23 S.Ct. 390, 47 L.Ed. 563; Meffert v. Medical Board, 66 Kan. 710, 72 P. 247, 1 L.R.A.(N.S.) 811, affirmed Meffert v. Packer, 195 U.S. 625, 25 S.Ct. 790, 49 L.Ed. 350.

Statutes which permit of revocation for "unprofessional conduct," "incompetency," "grossly immoral conduct" have been held valid in the large majority of jurisdictions notwithstanding their generality. Green v. Blanchard, 138 Ark. 137, 211 S.W. 375, Annotation, 5 A.L.R. 94; State Board of Medical Examiners v. Spears, 79 Colo. 588, 247 P. 563, Annotation, 54 A.L.R. 1504, at 1520 et seq.; Yoshizawa v. Hewitt (C.C.A. 9) 52 F. (2d) 411, Annotation, 79 A.L.R. 323; State Dental Examiners v. Savelle, 90 Colo. 177, 8 P. 693, Annotation, 82 A.L.R. 1184, 1188.

[2] Issues decided on the pleadings fall within the rule of res judicata. Divide Creek Irr. Dist. v. Hollingsworth (C.C. A. 10) 72 F.(2d) 859, 96 A.L.R. 937.

censee's gland operation, the claimed result of which is that dotards having desire without capability may cease to sorrow as do those without hope, and the complaint was not that the licensee is a quack of the common, vulgar type. Considered as a whole, the gravamen of the complaint is that, being an empiric without moral sense, and having acted according to the ethical standards of an impostor, the licensee has perfected and organized charlatanism until it is capable of preying on human weakness, ignorance, and credulity to an extent quite beyond the invention of the humble mountebank who has heretofore practiced his pretensions under the guise of practicing medicine and surgery."

(3) The board may, with its own rules or without rules, proceed according to fair and reasonable methods to hold its hearing. (4) A review on the merits is not necessary; nor is the power to enforce attendance of witness or compel production of documents. (5) The board is not a judicial tribunal, and due process does not require a judicial trial, and the character of the hearing is not measured by standards of judicial procedure. (6) Affidavits may be used freely by appellant, and by complainant if necessary.

■ This decision disposes of many of the questions now argued. Appellant produced 32 witnesses who testified at length to their ailments prior to their operations and their fine health afterward. Several days were spent listening to these recitals which were all essentially the same. · Appellant's counsel notified the board he expected to produce a thousand more. The board ruled he could use another day putting on oral evidence on that point and submit the testimony of the rest in affidavit form. Thirteen more selected witnesses testified and 364 affidavits of satisfied patients, and 75 affidavits as to his reputation as a surgeon and citizen, were offered and received. Complaint is made that the board did not devote the year to hearing these witnesses. The objection is frivolous. Even in judicial trials courts have power to prevent the proceedings from degenerating into a farce by limiting the amount of cumulative testimony.

■ It is argued that the board could not, in the time elapsing between the offer of the affidavits and the decision, have considered them. It is quite possible to digest the substance of a mass of similar affidavits in a very brief time, and there was evidence that the board "noticed the contents of every one of them." But cumulative testimony may be and routinely is curtailed without the privilege of supplementing it by affidavits at all. Complaint is made that some affidavits and letters were received by the board without sufficient foundation under the rule in Brinkley v. Hassig, supra. The letters for the most part gave reasons why the writer could not attend the hearing, and since there was no compulsory process, the letters were primary evidence that the writer would not come. Some of the affidavits used did not disclose the reason for nonattendance of the affiant at the trial. But it is to be presumed that the board and the Attorney General did their duty, and in the absence of a showing to the contrary, it will be presumed that affidavits were used only when it was not practicable to procure the attendance of witnesses. In any event, the affidavits were cumulative or upon inconsequential matters, and the error in procedure, if one there was, is not of sufficient importance to enable a court to say that a fair hearing was denied.

The principal contention now made is that the members of the board were prejudiced against appellant before the hearing started, and that some of them were active in instigating the complaint. Without detailing the evidence, it does appear that some of the board had expressed such prejudice, and doubtless all were in fact prejudiced. Dr. Hassig was president of the board. He was also secretary of the Medical Society, in which latter capacity he served as the intermediary through whom complaints were cleared, very much as the secretary of the State Bar Board receives complaints against lawyers, corresponds about them, and if a complaint is filed, sits as a member of the board. One of the board, after listening to testimony for three days, said he was ready to vote. The president told him that no vote could be cast until all the testimony was in. The impatient member assented, and resumed his task.

The spectacle of an administrative tribunal acting as both prosecutor and judge has been the subject of much comment, and efforts to do away with such practice have been studied for years. The Board of Tax Appeals is an outstanding example of one such successful effort. But it has never been held that such procedure denies con-

stitutional right. On the contrary, many agencies have functioned for years, with the approval of the courts, which combine these roles. The Federal Trade Commission investigates charges of business immorality, files a charge in its own name as plaintiff, and then decides whether the proof sustains the charges it has preferred. The Interstate Commerce Commission and state Public Service Commissions may prefer complaints to be tried before themselves. If an administrative tribunal may on its own initiative investigate, file a complaint, and then try the charge so preferred, due process is not denied here because one or more members of the board aided in the investigation.

The publicity used by appellant made public prejudice well-nigh inevitable. At any moment the program on the radio might change from cowboy songs to the diagnosis of disease and the extolling of the compound operation. That the members of the board had radios in their homes is no constitutional disqualification. The unusual thing about this case is that one issue to be tried was whether such radio talks were in fact given and whether they violated professional standards of conduct. Members of the board having radios thus had personal knowledge of the fact alleged, and necessarily formed some opinion as to whether they were in conflict with professional standards.

Assuming such preconceived prejudice, what is the answer? The statute provides but one tribunal with power to revoke a doctor's license, just as the Supreme Court of Kansas is the only body with power to disbar a lawyer. If such powers may not be exercised if the members of the board or court are prejudiced, then any lawyer or doctor who commits an offense so grave that it shocks every right-thinking person, has an irrevocable license to practice his profession if he can get the news of his offense to the court or board before the trial begins. That will not do. The commendable efforts of the medical and legal professions to raise the standards of their professions by cleaning their own houses cannot be set at naught by any such rule of law.

■■■ From the very necessity of the case has grown the rule that disqualification will not be permitted to destroy the only tribunal with power in the premises. If the law provides for a substitution of personnel on a board or court, or if another tribunal exists to which resort may be had, a disqualified member may not act. But where no such provision is made, the law cannot be nullified or the doors to justice barred because of prejudice or disqualification of a member of a court or an administrative tribunal. In Evans v. Gore, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887, 11 A.L.R. 519, a question arose in which the members of the court had a direct personal financial interest. Adverting to this regretful circumstance, the court declined to renounce jurisdiction which appellant was entitled to invoke since "there was no other appellate tribunal to which under the law he could go." Cases have arisen where all the members of state Supreme Courts have been jointly sued by disappointed litigants; confronted with the choice of denying the suitor his right of appeal or hearing it themselves, the courts have heard the appeal. An exhaustive note gathering and analyzing the cases from twelve states and from England and Canada may be found in 39 A. L.R. 1476. Other authorities may be found in 42 L.R.A.(N.S.) 788, L.R.A.1915E, p. 858, and in 33 C.J. 989, and 15 R.C.L. 541. In Stahl v. Board of Sup'rs, 187 Iowa, 1342, 175 N.W. 772, 777, 11 A.L.R. 185, the court suggested that one so disqualified might resign. But the law does not require a member of a court or a tribunal to resign his position because of an isolated case where he must act although interested. The trial court, after patiently hearing the evidence as to the attitude of mind of the individual members, disposed of the contention in this language with which we are in accord:

"Under the general terms of the statute, the Medical Board is empowered to protect the public against conduct which is clearly against public interests and therefore necessarily unprofessional, the same as if the legislature had specifically denounced and prohibits such practice. The members of the board were not disqualified because they knew of his methods prior to the hearing and condemned them. John R. Brinkley's methods were so notorious that ignorance of them by members of the board was an impossibility and such knowledge compelled condemnation."

■■ Other matters argued do not warrant detailed discussion. Appellant called the members of the board as witnesses and their mental reactions to various bits of evi-

dence were explored. Naturally the members could no more appraise the precise weight which they gave to each fact than can jurors or courts. But the inability to dissect the mental processes by which a finding is reached is not fatal; the Supreme Court, in Des Moines Gas Co. v. Des Moines, 238 U.S. 153, 35 S.Ct. 811, 814, 59 L.Ed. 1244 sustained an appraisal of a master who·frankly stated that he "could not give the mental process by which this conclusion is reached any more than a jury could do." Findings of administrative tribunals, like verdicts of juries, cannot be overturned by a dissection of the mental processes by which the result is reached, as long as it is reached from a consideration of substantial evidence produced at the hearing. The trial court would have been well within its power if this minute exploration of the mental reactions of the members of the board to particular items of evidence had been drastically curtailed.

It was not the function of the trial court to retry this case on the merits,·and we are not persuaded that the learned trial court did so. Nor is it our function. Whatever may have been the attitude of the trial court is now immaterial, for this is an equity appeal. We have examined the record and readily conclude that appellant's constitutional rights have not been infringed.

The decree accordingly is affirmed.