CLARENCE F. AVERY, Individually and as Liquidating Partner of AVERY & Co., Plaintiff, *v.* FRED C. MOFFATT, as Acting President of the NEW YORK CURB EXCHANGE, Defendant.

Supreme Court, Trial Term, New York County, April 16, 1945.

580

*William H. Friend* for plaintiff.

*William G. Mulligan* and *Martin J. Coughlin* for defendant.

SHIENTAG, J. The plaintiff, individually and as liquidating partner of the firm of Avery & Company, has failed to establish any cause of action against the New York Curb Exchange (a) for alleged illegal suspension of two of his partners who were regular members of the exchange and for the alleged wrongful dissolution of his firm; (b) for the refusal of the exchange, after the firm of Avery & Company had been dissolved, to permit a member firm of the exchange to employ the plaintiff individually as its registered representative.

After a full investigation and a series of painstaking, comprehensive hearings, initiated at the instance of the United States Securities and Exchange Commission, the Committee on Stock Transactions of the New York Curb Exchange, composed of seven members, unanimously preferred charges against Clarence B. Rogers and John M. Jones, "Regular Members of the Exchange and general partners in the regular member firm of Avery & Company ".

The charges against Rogers and Jones (four in number) were to the effect that their firm had traded against orders received

from customers, in violation of its fiduciary obligations; that the firm had engaged in certain transactions in Quaker Oats and other specified stocks dealt in on the New York Curb Exchange, which transactions were inconsistent with fair and equitable principles of trade and in violation of the rules of the exchange; and that improper charges for commissions had been made by the firm. The charges were preferred on February 16, 1942, and copies were served on the accused and also sent to the other general partners of Avery & Company (including the plaintiff) who were not regular members of the exchange.

The chronology of events will be interrupted to point out that as the exchange is organized its regular members are individuals. If a regular member is a partner in a firm doing a securities business, that firm may be registered with the exchange as a regular member firm. The latter, although having certain privileges and subject to a certain amount of supervision, is, under the constitution of the exchange, not a member thereof. (Meyer on Law of Stock Brokers and Stock Exchanges, p. 133.)

The term " member " as defined in the constitution does not include a member firm (art. XII-c). Indeed, article V of the constitution entitled " Discipline of Members " deals exclusively with the individual members (there is a reference to a member firm in section 3 of article V dealing with suspension for insolvency or failure to meet obligations). Discipline is maintained through action against the regular members individually and through their connection with any firm in which they are partners, or any office or business relationship in which they, or their firm, or any of their partners, are interested (Constitution, art. V, § 5).

Section 4 (p) of article V provides that " A member of the Exchange is liable to the same discipline and penalties for any act or omission of his firm * * * as for his own personal actions or omissions * * *." The wrongful acts with which Rogers and Jones were charged were the acts of their firm of which they had no personal knowledge. The firm consisted of four general partners: Rogers with 15% interest, Jones 2%, Hooper 5%, and the balance of 78% divided between the plaintiff Avery and his wife (the latter a special partner). Avery was the dominant partner and dictated the policies of the firm. The equitable title to Jones's seat on the Curb Exchange was held by the firm.

Formal charges were not filed against Avery or against his firm because under the constitution of the exchange they, not being members thereof, were not directly subject to discipline.

On February 26, 1942, Rogers and Jones filed their joint answer. This answer was prepared by Avery with the assistance of counsel he had retained and whom Rogers and Jones never consulted.

On February 28, 1942, the accused were notified in writing by the secretary of the Board of Governors of a special meeting of the board to be held on March 3, 1942, at 3:15 P.M. to consider the charges against them and to show cause why they " should not be dealt with in accordance with the Constitution rules and regulations of the New York Curb Exchange relative to the conduct of Members ". Avery received notice of the trial. He was present and he as well as his accused partners were heard. The trial was concluded that evening. Twenty-one governors voted. They were unanimous on the guilt of the accused as to three of the charges. One governor voted " Not Guilty " on the third charge which dealt with the improper billing of commissions.

By a resolution which is in two parts, but which it appears from the testimony was voted on as a whole, Rogers was suspended for eighteen months, Jones for six months, and the firm of Avery & Company ordered dissolved in accordance with section 5 (a) of article V of the constitution of the exchange.

On March 4, 1942, Rogers and Jones were advised of the action taken, and on the same day a letter was sent to Avery & Company, advising them that " At a special meeting of the Board of Governors held March 3, 1942 the Board ordered the dissolution of your firm in accordance with Article V, Section 5 (a) of the Constitution ". On March 14, 1942, Avery & Company notified the exchange that their firm had been dissolved. Rogers acquiesced in the penalty imposed upon him, and subsequently was reinstated to membership on the exchange. Jones sued the exchange for damages for wrongful suspension and that action is now pending█ Avery, after he had made several unsuccessful attempts to obtain the approval of the exchange to his employment as a registered employee of a regular member firm of the exchange, instituted this action.

(1) The suspension of Rogers and Jones and the dissolution of the firm of Avery & Company were not the result of malice, ill will or personal hostility, nor were they the result of arbitrary action on the part of the Board of Governors. The decision of the board was rendered on the merits of the charges presented without regard to any extraneous consideration. " In the

absence of allegations and proof of fraud or bad faith on the part of the membership as a whole, no recovery of damages may be obtained." (*Browne* v. *Hibbets,* 290 N. Y. 459, 467; see, also, *Havens* v. *King,* 221 App. Div. 475, 481, affd. *sub nom. Havens* v. *Dodge,* 250 N. Y. 617; *Schouten* v. *Alpine,* 215 N. Y. 225; *Benton* v. *Minneapolis Tailoring & Mnfg. Co.,* 73 Minn. 498, 506; *Sullivan* v. *Barrows,* 303 Mass. 197.)

(2) The decision of the Board of Governors of the exchange having been honestly arrived at, this court is without power to retry the issues even if the board was mistaken in its judgment. It suffices that there is some substantial evidence to sustain the conclusions reached. " Those acting in a *quasi* judicial capacity are not liable for errors of judgment in erroneous decisions in determinations affecting the personal or property rights of others in the absence of malice." (*Lurman* v. *Jarvie,* 82 App. Div. 37, 44, affd. 178 N. Y. 559.) Indeed one case has gone so far as to hold: " The question for the court is not whether, passing upon the evidence as *res nova,* it would have reached the same conclusion as that of the board of managers, or whether the conclusion was reasonable or unreasonable, but simply and wholly whether the case was so bare of evidence to sustain the decision that no honest mind could reach the conclusion that the relator's conduct was ' inconsistent with just and equitable principles of trade.' (See *Dawkins* v. *Antrobus,* L. R. [17 Ch. Div.] 615.) " (*Peo. ex rel. Johnson* v. *N. Y. Produce Exch.,* 149 N. Y. 401, 414.)

(3) The punishment, although severe in a case where the accused concededly were without knowledge of the wrongful conduct of their firm, was warranted by the provisions of the constitution to which they subscribed directly, and to which their firm also bound itself. The penalty was not so tyrannical or arbitrary as to require or even to permit judicial interference.

(4) The trial was undoubtedly a hurried one. This was in marked contrast to the careful, painstaking, thorough investigation of the Committee on Stock Transactions, and the full hearings held by that committee. The trial, however, did not violate fundamental rights of the accused. Confrontation of witnesses is the general requirement. Here, instead, the testimony of the witnesses as given before the Committee on Stock Transactions was read to the Trial Board. No objection to this procedure was voiced by the accused or by Mr. Avery. They acquiesced in it and cannot now be heard to complain. (*West* v. *Platt,* 127 Mass. 367, 372; *Pitcher* v. *Board of Trade,* 121

Ill. 412; *Empire Trails* v. *United States,* 53 F. Supp. 373; *Williamson* v. *Randolph,* 48 Misc. 96.) The accused and the plaintiff Avery had attended hearings before the Committee on Stock Transactions; they had been furnished with a complete transcript of all of the testimony; they had had an opportunity of calling any witnesses they desired before the committee, of which they availed themselves; Avery asked for and received the right to question certain of the witnesses through the chairman of the committee, and to some extent directly himself.

There was no substantial dispute as to the facts; there was some difference as to the inferences to be drawn from those facts, and the accused and Mr. Avery denied any wrongful intent. They had the opportunity at the trial of requesting the presence of any or all of the witnesses who had previously testified before the Committee on Stock Transactions. They were specifically told they could call any witnesses they desired. They failed to avail themselves of that opportunity and it is too late to raise the point now. (5 Wigmore on Evidence, § 1371; Meyer on Law of Stock Brokers and Stock Exchanges, pp. 99-100; *Smith* v. *Phillips National Bank,* 114 Me. 297.)

Ordinarily the practice of reading the testimony previously taken is not a good one, but it is a practice which appears to have been generally followed by the exchange. It is not, under the circumstances of this case, at any rate, unlawful (*United States* v. *Standard Oil Company of California,* 20 F. Supp. 427, 448; *Plapao Laboratories, Inc.,* v. *Farley,* 92 F. 2d 228, certiorari denied 302 U.S. 732; *Pitcher* v. *Board of Trade,* 121 Ill. 412, *supra; Empire Trails* v. *United States,* 53 F. Supp. 373, *supra; Eastland Co.* v. *Federal Communications Commission,* 92 F. 2d 467; *State ex rel. Am. Telechron Co.* v. *Baker,* 164 Wash. 483).

No request of any kind was made for an adjournment. The failure to call the witness Usifer whom Avery had brought to testify with respect to the third specification was entirely an inadvertence. If during the trial he had requested that that witness be called his request would undoubtedly have been granted.

(5) The participation in the trial of governors who were also members of the Committee on Stock Transactions which preferred the charges is a matter which has given the court deep concern. Five of the committee members who had signed the charges sat as members of the Board of Governors and voted with the overwhelming majority that Rogers and Jones

were guilty as charged and that they should be suspended from the exchange and their firm dissolved. But this practice, although it goes against the grain, is not unlawful, particularly where the constitution of the exchange to which its members and their firms have subscribed specifically permits it. Section 1 (b) of article II of the constitution provides "No member of the Board shall participate in the determination of any matter brought before it in which such member has a personal interest; but membership on a committee which has made prior inquiry or investigation of the subject under examination by the Board with or without recommendation thereon shall not constitute any such disqualification." The question, therefore, is whether a course of procedure which was clearly within the terms of this section of the constitution is so repugnant to traditional Anglo-American principles of fair play or to a sense of natural justice, that it should serve as the basis of a judgment in damages. (*Morgan* v. *United States,* 304 U. S. 1, 14–15; *Federal Comm'n* v. *Broadcasting Co.,* 309 U. S. 134, 142-143; *Young* v. *Eames,* 78 App. Div. 229, affd. on opinion below, 181 N.Y. 542.)

It has been held that when the rules of a voluntary association are followed the courts will not interfere with disciplinary action taken against a member solely because the charges are preferred by a member of the governing board which is to try the case (*Nat. League of Commission Merchants* v. *Hornung,* 148 App. Div. 355; *Green* v. *Board of Trade,* 174 Ill. 585; *Wood* v. *Chamber of Commerce,* 119 Wis. 367).

The court is advised, in a brief filed by the United States Securities and Exchange Commission on this point as *amicus curiæ,* that provisions similar to that of the constitution of the New York Curb Exchange, permitting dual participation, are contained in the constitutions of ten of the eighteen other exchanges registered with the commission; that the commission never criticized these provisions or construed the Securities Exchange Act of 1934 (U.S. Code, tit. 15, § 78a) as requiring exchanges registered thereunder to divorce the functions of preferring charges and of trying members.

It is pointed out that in cases where the commission institutes adversary proceedings it, like the exchange, combines the functions of first investigating suspected violations, then instituting various types of administrative proceedings, and ultimately performing the quasi-judicial function of determining what action, if any, to take against the respondents. The same functions, it is pointed out, have been performed by the Inter-

state Commerce Commission and the Federal Trade Commission for many years, and their decisions and proceedings have been reviewed by the Circuit Courts and by the Supreme Court of the United States on numerous occasions, but no case has been brought to my attention holding that an administrator who prefers charges is thereby disqualified from hearing them. (*J. W. Kobi Co.* v. *Federal Trade Commission*, 23 F. 2d 41; *Reynolds* v. *United States*, 68 F. 2d 346; *Brinkley* v. *Hassig*, 83 F. 2d 351.) The duality of functions performed by such agencies does not contravene the Fifth Amendment to the Federal Constitution or other Federal or State constitutional provisions. It would seem therefore not to conflict with the more indefinite, although compelling, standards of fair play or natural justice applicable to proceedings conducted by a voluntary association on a contractual basis. So far as voluntary associations,. such as the Curb Exchange, are concerned the court is not at all impressed with the wisdom of permitting dual participation or with its necessity; but certainly in the light of the specific provision of the constitution of the exchange on the subject, the practice cannot be held to be unlawful.

(6) Was the vote on the suspension of Rogers and Jones and on the dissolution of the firm of Avery & Company in accordance with the requirements of the constitution of the exchange? So far as the vote on the suspension of Rogers and Jones is concerned there is some doubt.

Prior to the amendment in 1940 the constitution of the exchange provided: " A member of the Exchange is liable to the same discipline and penalties for any act or omission of his firm or of his representative, authorized pursuant to Article IV, Section 1(e) hereof, as for his own personal acts and omissions; but the Board may, in its discretion, by a vote of not less than nineteen governors, relieve such member from the penalty therefor." (Art. V, § 4 [p].) (Article IV, section 1[e], provides for the designation by a regular member of an authorized representative to execute orders on the floor of the exchange.)

In 1940 this section was amended by adding thereto after the word "therefor" without any punctuation: "or may impose upon such member such penalty as the Board may in its discretion deem appropriate". This section is the expression of the policy of the New York Curb Exchange that every member of the exchange shall be responsible for the acts of his firm. Prior to July, 1940, the section provided that the Board of Governors might in its discretion by a vote of at least nineteen

governors relieve a member from the penalty for an act of his firm. The amendment of 1940, which was set forth above, has been interpreted by the governors of the exchange to be for the purpose of giving the Board of Governors a right not alone to relieve a member from the penalty, but to impose upon him a penalty less than that which might have been imposed upon him under the constitution or rules for the offense committed by the firm; in other words that the vote of nineteen governors is necessary either to relieve a member from liability for the acts of his firm, or to permit the Board of Governors to impose a lesser penalty against a member for the wrongful acts of his firm than would otherwise have been the case.

The plaintiff, on the other hand, contends that the proper construction is that any penalty imposed upon a member for the wrongful acts of his firm, of which he had no knowledge, must be by a vote of nineteen of the governors.

The provision as amended is somewhat ambiguous. A good deal may be said in support of each of the contentions and the provision certainly needs clarification. As I construe the section I incline to the plaintiff's interpretation. Nevertheless the constitution of the exchange specifically provides that the Board of Governors " shall be authorized and empowered to interpret the Constitution and Rules of the Exchange and such interpretation shall be conclusive and binding upon all members". (Art. II, § 1 [b].) Under those circumstances where there is a reasonable basis for the interpretation placed upon the section by the Board of Governors, although that interpretation may be a mistaken one, members of the exchange and their firms are bound by it. (*Bartlett* v. *L. Bartlett & Son Co.*, 116 Wis. 450.) As was said in the case of *Industrial & General Trust, Ltd.*, v. *Tod* (180 N. Y. 215, 226): " The power to construe and the engagement that the construction shall be final mean that it shall be final if the members of the committee act in good faith, but not otherwise. They were, doubtless, protected from the outcome of errors of judgment and honest mistakes, but good faith is the standard, erected by the law, by which all their acts and omissions are to be judged." It is clear that the interpretation of the defendant was made in entire good faith.

With respect to the dissolution of the firm of Avery & Company, the resolution was adopted under the authority of section 5(a) of article V of the constitution which does not specify the required number of votes. The number of votes required under that section is governed by section 4(b) of article V, which

provides: '' Unless otherwise specifically provided, the penalty of suspension from membership may be inflicted and the period of suspension determined, by the vote of a majority of the Board ''. (See, also, constitution, art. II, § 1[b].) There were thirty-two members of the board, with twenty-one voting at the conclusion of the board trial, on March 3, 1942. There were at least eighteen votes for the motion, if not twenty, Mr. Judson and Mr. Phelps having testified at the trial that though they voted against the suspension, each voted in favor of the dissolution.

(7) The dissolution of the firm of Avery & Company. The plaintiff contends that the exchange had no power to require the dissolution of the firm of Avery & Company after it found its partners, who were regular members of the exchange, guilty of unfair business practices and suspended them. Plaintiff further contends, in that connection, that if the exchange did have the power to require the dissolution of the partnership, the fundamental rights of the partnership were violated in that no charges were filed against it, and it was deprived of an opportunity to interpose its defense.

The power to dissolve a partnership is derived from section 5(a) of article V of the constitution, reading as follows: '' Whenever it shall appear to the Board that a member has formed or entered a partnership, has established an office or headquarters, is individually or through any member of his firm, interested in a partnership or business or has formed any business connection whatever, whereby the interest or good repute of the Exchange may suffer, the Board may require the dissolution of any such partnership or discontinuance of such business, office, headquarters or business connection, as the case may be ''. This provision is not entirely clear concerning the scope and effect of the dissolution, but it must be read in the light of its background and is of course to be limited in its operation and scope to the purposes and objects of the exchange. Rogers and Jones agreed to the authority of this section when they became members of the exchange (constitution, art. IV, § 1). Avery & Company must be deemed to have assented thereto when it registered with the exchange as a member firm. '' Only individuals are recognized as members. Therefore, a firm desiring to do an exchange business must have one or more partners who is an exchange member. Such firms, although not admitted to membership, are permitted to enjoy the privileges of the exchange which are conferred on them by exchange rules. They are also bound by the rules and

must comply with them." (Meyer on Law of Stock Brokers and Stock Exchanges, p. 133.)

Moreover, the partnership agreement of Avery & Company specifically provided as follows: " 31. Rules of Exchange. This agreement and all matters and things to be done and performed in connection with this Copartnership shall be subject to the Constitution and Rules of the Exchange in which the partners own memberships ". Jones, Rogers and Avery & Company were therefore contractually bound to act in compliance with the resolution adopted on March 3, 1942. What does this provision for the dissolution of a partnership contemplate? Primarily, it is intended to cause a regular member of the exchange, engaged in doing business on the exchange, to sever his connection, that is, to withdraw as a partner in a firm the conduct of which is harmful to the best interests or the good repute of the exchange. In the present case, Rogers and Jones, the only partners of Avery & Company, who were regular members of the exchange, were suspended for eighteen and six months respectively. Hooper, another partner of Avery & Company, had withdrawn as such before the date of the trial. The only remaining general partner of the firm was the plaintiff Avery himself.

The theory of the dissolution, as I understand it, was that the exchange, in the event that Rogers and Jones should be reinstated as members, did not desire to have them continue in association with Avery, or as partners of his firm. That is the only effect that the order of dissolution could have. Jones and Rogers were free to disregard it in the event that they contemplated doing no business as members of the exchange. The resolution requiring the dissolution of the partnership, regardless of the form that it took, was primarily directed to the two partners Rogers and Jones who were regular members of the exchange. The exchange could take action only through such individual partners who were its members. The fact that a notice of the passage of the resolution of March 3, 1942, was sent to Avery & Company, as well as to the two regular members, its partners who had been suspended, is not significant. Avery received notice of all steps taken in the proceeding.

Moreover, the order of dissolution may not be construed as an order requiring the liquidation of the affairs of the partnership. Notwithstanding the required dissolution, the firm, including Rogers and Jones, could do any business in the securities market, so long as that firm or any of its partners did no business on the Curb Exchange.

The resolution requiring dissolution of the firm may not be construed as a requirement of the liquidation of the firm, and the winding up of its affairs. The New York Partnership Law (§ 60) defines dissolution as " * * * the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Dissolution as used in the statute designates the point in time when the partners cease to carry on the firm's business together (Partnership Law, § 61.) Whenever a partner withdraws from a firm, that operates as a dissolution of the then existing firm.

Actually what happened was that the partnership was liquidated, not because of the order of dissolution of the exchange, but because its usefulness had been impaired. Even before the trial, steps had been taken toward the winding up of the partnership. Most of its business and of its personnel had been transferred to another firm. Construed as has been here indicated, the resolution of dissolution — the direction that Rogers and Jones withdraw as partners in the firm — came within the authority conferred by section 5(a) of article V of the constitution of the exchange.

But, it is urged by the plaintiff, assuming that the exchange had the right to order the dissolution, it did so in violation of its constitution and rules in that it failed to serve any charges on the firm, and in the absence of such charges had no right to take the action complained of. The difficulty with this contention is that the exchange acted in the only way that it could act. It could file charges under its constitution only against its regular members. It could not file charges against the firm, or against any partner of the firm, who was not a regular member of the exchange.

Moreover, assuming that charges should have been preferred against the firm as well as against the individual partners who were members of the exchange, the failure so to do was, under the circumstances of this case, entirely unsubstantial and unprejudicial. Avery was advised from the outset that the conduct of his firm was under investigation. He participated actively in the hearings before the Committee on Stock Transactions. He submitted statements on behalf of his firm outlining the firm's position and a comprehensive memorandum in support of the contentions of his firm. He it was who consulted counsel and who prepared the answer of his two partners. It was the conduct of the firm rather than the conduct of the partners who were members of the exchange that was being found fault

with. Those partners were accountable only because of the specific provision in the constitution of the exchange which rendered them liable and subject to discipline for conduct of their firm, whether done with or without their knowledge.

Avery caused corrections to be made in the testimony taken before the Committee on Stock Transactions. He was present at the trial. Every statement he made indicated that it was the conduct of his firm that was being attacked and which he sought to defend. Under all those circumstances the failure to serve the firm formally with any charges was not a deprivation of any fundamental right of the firm. It resulted in no prejudice to them. The proceedings having been pursued in good faith with no ulterior motives this court may not impose damages against the membership of the exchange.

The suggestion that Avery & Company if not ordered to be dissolved could have continued doing business on the Curb Exchange by taking in a partner who was, or would become, a regular member of the exchange is entirely without substance. When the exchange ordered the suspension of Rogers and Jones it did so because Avery & Company, in which firm they were partners, was found guilty of trading against orders received from customers, and of doing other acts inconsistent with fair and just principles of trade. If the exchange ordered the suspension of members of that firm who did not themselves participate in these wrongful transactions, and had no knowledge of them, it is most farfetched to assume that they would permit any of its regular members to make a business connection with the firm of Avery & Company, and as to this under the constitution and rules they had full power of control.

(8) There is no basis for liability on the part of the exchange for the refusal of the Board of Governors to authorize a member firm of the exchange to employ the plaintiff Avery as its registered representative. The last time such an application was voted on by the Board of Governors was on December 15, 1943. The vote was nine to eight. Only because of a fortuitous occurrence, the departure of one of the governors who was in favor of granting the application, was the proposition defeated. Here again the court may not substitute its judgment for that of the board. One of those who voted against the application was a public member of the Board of Governors, a man of wide experience, and he certainly was influenced by no consideration other than the welfare of the exchange. The court, it must be said, is critical of the attitude of several of the members of the board in this connection, but the great majority of

those who voted against the application did so in good faith and were actuated by proper motives. The membership of the exchange as a whole may not be held liable in damages because one or two of its governors should perhaps have disqualified themselves from participating in the vote.

(9) The charge of conspiracy to deprive the plaintiff and his firm of proper legal advice is entirely without foundation and is, I am obliged to say, solely a figment of the plaintiff's imagination.

The court is mindful of the importance of effective enforcement by exchanges of their own rules with respect to fair trade practices. Disciplinary proceedings in the New York Curb Exchange and in other securities exchanges throughout the country are of vital importance to the public interest and the protection of investors. The Federal public policy as enunciated in the Securities Exchange Act of 1934 and construed by the courts does not place upon the Securities and Exchange Commission the entire burden of policing the exchange markets, but relies in some measure upon the exchanges themselves to assure high standards of trade and to discipline members who violate those standards (*Baird* v. *Franklin*, 141 F. 2d 238, 244). Moreover, securities trading is a highly complex field in which it is not always feasible to define by statute or by administrative rules having the effect of law every practice which is inconsistent with the public interest or with the protection of investors. As a result there is a large area for the operation of exchange rules on the level of business ethics rather than law, and in that sphere the statute leaves it to the exchanges to carry on the necessary work of prevention and discipline.

While it is essential to protect the rights of members and of their firms and those otherwise connected with them in business, exchanges should not be held to technical standards in their disciplinary proceedings; otherwise it would "greatly embarrass and many times defeat the disciplinary regulations of such association." (*Peo. ex rel. Johnson* v. *N. Y. Produce Exch.*, 149 N. Y. 401, 413, *supra.*) The rules are drafted by laymen. They are interpreted by laymen. Trials are presided over by men unfamiliar with law and with legal requirements. The proceedings are necessarily informal and more or less summary in character. So long as fundamental rights are preserved, so long as the action taken is actuated by good faith and honesty and is free from the taint of malice or personal hostility, or arbitrary conduct, the courts will not interfere, by way of awarding damages against the membership even though

the conclusion reached was a mistaken one or the correct procedure was not followed. Accordingly judgment is awarded in favor of the defendant dismissing the complaint on the merits. Exception to the plaintiff. Let judgment be entered accordingly.