FIRST AMERICAN BANK & TRUST COM-
PANY, a domestic corporation,
et al., Appellees,

v.

G. W. ELLWEIN, State Examiner and Com-
missioner, Department of Banking and Fi-
nancial Institutions, et al., Appellants.

Civ. No. 8967.

Supreme Court of North Dakota.

June 28, 1974.

Rehearing Denied Aug. 1, 1974.

Frederick E. Saefke, Jr., Lundberg & Nodland, Bismarck, for appellees.

Allen I. Olson, Atty. Gen., Bismarck, Frank F. Jestrab and John R. Gordon, Special Asst. Attys. Gen., Williston, for appellants.

JAMES H. O'KEEFE, District Judge.

This case has a long, entangled past. There will be no attempt to summarize in detail all of the various forms of litigation and hearings. We will sketch a broad outline that will assist in understanding this opinion. The prior procedures are a maze of false starts, personal attacks, unbelievable allegations, and a series of appeals. We view this case in that context. The central fact is that the State Banking Board (hereinafter referred to as the "Board") has undertaken a massive administrative and legal effort to close down the operations of First American Bank & Trust Company, a Bismarck corporation (hereinafter referred to as "FAB").

The immediate case is an appeal from the findings of the Board on December 12, 1972, ordering a receiver be appointed to liquidate FAB on the basis of insolvency.

The administrative hearing leading to this order began on June 19, 1972, continued through June 29, 1972, and resumed again for two days in September. The transcript from such hearing is literally voluminous. The Honorable M. C. Fredricks, District Judge, reversed the decision of the Board and found that FAB was not afforded a fair hearing, and that the findings of insolvency were not supported by the evidence.

Here is the case-by-case appellate history:

(1) State ex rel. Holloway v. FAB, 186 N.W.2d 573 (N.D.1971). The State Securities Commissioner and the State Examiner in 1970 began injunctive proceedings against FAB alleging bad practices in the conduct of its business. The case was remanded to District Court for further proceedings.

(2) State ex rel. Holloway v. FAB, 197 N.W.2d 14 (N.D.1972). A second appeal from a pre-trial order was made. Upon the remand, the trial court appointed a special master to examine FAB records. The State Examiner, after this action commenced, found FAB to be insolvent and such report was filed with an approval by the State Banking Board on June 28, 1971. FAB then asked to amend the pleadings to raise the issue of solvency. The trial court denied the request and the Supreme Court agreed.

(3) FAB v. Ellwein, 198 N.W.2d 84 (N.D.1972). The State Examiner issued two orders: 1. to have FAB relinquish all records, and 2. to in effect stop doing business or in the alternative show cause before the Board on July 1, 1971 why a receiver should not be appointed. The trial court found both orders void and the State Examiner then appealed. District Judge C. F. Kelsch, writing for this Court, said Order No. 1 was within the power of the State Examiner, acting for the Board. He then said, however, that FAB could obtain a hearing on both orders before the full Board, that is, an ex parte order of the State Examiner is subject to review by administrative hearing before the Board and the Board's decision is a subject of District Court appeal.

(4) FAB v. Ellwein, 8 Cir., 474 F.2d 933 (C.A.1973). FAB sought injunctive relief against a hearing by the Board. The Eighth Circuit remanded the case back to Federal District Court to reflect absention from action rather than a decision on the merits. The net effect was to leave open the question of a "fair hearing" and see how the state courts viewed it.

(5) Securities & Exchange Commission v. FAB, 481 F.2d 673 (8 C.A.1973). SEC sought an injunction against FAB. The Eighth Circuit did agree partly with the contentions made by SEC but we cannot see where the decision had a bearing on our issues.

There are three issues presented by this appeal:

1) Is the Board properly constituted and thus able to act?

2) Did FAB receive a fair hearing before the Board?

3) If so, was there sufficient evidence to sustain the findings of the Board declaring insolvency?

If the answer to either of the first two issues is in the negative, our work is ended because, obviously, it would then make no difference as to what the findings of the Board were. Numerous charges of conspiracy, wrongdoing and impropriety have been leveled at State officials, Board members and others. This writer and other judges questioned in oral argument how this Court could consider statements indicating a conspiracy to down FAB that were made outside of the record. We shall not repeat these charges, because to do so would be insulting, and, moreover, we are not going to deal with them in our decisional process. The trouble is, none of the charges are supported by the record we have before us. The evidence considered by the District Court and by this Court shall be confined to the record filed with the Court. 28–32–19, N.D.C.C. To consider unrebuttable charges would violate the fundamental concept of fair play and due process that FAB urges upon us.

■ The District Court has said that the makeup of the Board is "all wrong." FAB makes the point that bankers should not judge bankers. No matter how chosen, a board rarely can be ideally constituted. Should we have no bankers on the board? There is no inherent reason why a banking board should not have bankers sitting just as a bar grievance committee has lawyers. We do not think the statutory scheme of regulation is unconstitutional. Our laws seem to provide a sensible requirement for the appointment to the Board. 6–01–03, N.D.C.C. This statute was amended in 1969 to broaden membership on the Board to loan associations. The recent case of Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), upheld a contention that the Alabama Board of Optometry was unconstitutionally constituted and so did not provide an adequate administrative remedy. The Supreme Court agreed with the conclusion that the State Board was so biased by prejudgment and pecuniary interest that it could not constitutionally conduct hearings looking toward the revocation of a license to practice optometry. There were two sources of possible bias—prejudgment of the facts or personal interest in the outcome by the board members. The Supreme Court said that those with substantial pecuniary interests in legal proceedings should not adjudicate those disputes.

■■ The logic of this holding applies with some force in our case. *Gibson, supra,* determined there was a serious question of personal financial stake in the matter in controversy because the board excluded from membership a large group of salaried optometrists and sought to enjoin them from practicing their profession. We think the pecuniary interest of our Board in this case is rather vague and certainly slight. It stretches the point to say that a Board member from, say, Kindred, North Dakota, is going to be benefited by putting FAB out of business. The "interest" of the Board would arise from taking a prior position which, in the nature of things, is hard to reverse. We are, therefore, not saying, as did the trial judge, that the Board, as composed, is ipso facto unconstitutional because it has banker-members. We cannot say that the requirements for membership on the Board are irrational, or that they bear no reasonable relationship to the function of the Board, or that they exclude a segment of the banking community.

FAB argues that it really had no hearing on the merits and desperately wants one. At best this is a fragile argument for two reasons: They did indeed have a hearing and they did participate in it by extensive examination of witnesses. The fact that they made a "special appearance" and did not perhaps participate to the full extent available was a matter of their choice. The danger of abstention was a risk they knowingly undertook and even though it

may not have changed the result they shall not now be heard to say they have had no hearing. The role of Mr. Saefke, FAB's attorney, was more in the nature of a general appearance. But see Northern Pac. Ry. Co. v. McDonald, 77 N.D. 194, 42 N. W.2d 321 (N.D.1950). The question of the type of appearance is not now important because the Board did have jurisdiction and, as shall be seen, it did conduct the hearing within due process guidelines.

■ Aside from their role, or non-role in the hearing, was it "fair"? FAB says, in a colorful display of verbiage, the hearing that was held was designed in the great tradition of the Old West to be a fair trial before the hanging. The Board had already been deeply embroiled in efforts to declare FAB insolvent. The State Examiner is chairman of that Board. These efforts took the form of various legal actions in Federal and State courts as previously referred to. It is apparent that counsel for the Board took an active part in cooperating and exchanging information with the SEC, which, in turn, presumably resulted in their entry into the fray. After these efforts were unsuccessful they turned to an administrative hearing. The State Examiner had, to some extent, determined the condition of the Bank by the issuance of his prior orders. Mr. Frank F. Jestrab, as attorney for the Board, filed a Complaint against FAB. He represented the Board in all the litigation. The Board approved the report of insolvency by its examiner *prior to the hearing*. This is not to say the findings are incorrect. The correctness of the findings does not make the hearing fair. Due process of law presupposes a fair and impartial hearing before a fair and impartial tribunal. The board hearing the case should be a qualified board without prejudice and strictly impartial as to the issues to be tried. Smith v. Department of Registration, Etc., 412 Ill. 332, 106 N.E.2d 722 (1952); see, In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). As

a general proposition of law we accept the preceding sentence, but the circumstances of our case require the consideration of other factors, and we do not think our decision violates that proposition.

It is unfortunate in light of the powers and duties placed upon the State Examiner that he is also required to act as chairman of the State Banking Board, which is the board which must ultimately decide what action is proper with regard to all complaints, reports and recommendations made by this same Examiner. We invite the attention of the Legislature to this structural weakness. The involvement of the State Examiner is more than ministerial. Where investigation, prosecution and decision rest with the same body, its members should be zealous in the recognition and preservation of the right to a hearing by impartial triers of the fact. We suggest that it has the appearance, if not the substance of partiality, to allow the Examiner to sit in judgment at these hearings. To perform its high function in the best way, justice must satisfy the appearance of justice. Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). We realize that for now the State Examiner could not step down without abrogating a statutory command. The Examiner is, at once, accuser and judge.

In discussing the make-up of the Board itself, we note that many administrative agencies such as the Banking Board are charged by statute with a tripartite responsibility of performing investigative, accusative, and adjudicative functions.

■ The mere fact that all three functions are combined in one board is not in itself a denial of due process. Pangburn v. Civil Aeronautics Board, 311 F.2d 349 (1st Cir. 1962), at page 356; Griggs v. Board of Trustees, 61 Cal.2d 93, 37 Cal.Rptr. 194, 389 P.2d 722 (1964); Fireman's and Policeman's Civil Service Commission v. Hamman, 404 S.W.2d 308 (Tex.1966); and Borman v. Tschida, 171 N.W.2d 757 at 764

(N.D.1969). However, as stated in footnote No. 17 in Gibson v. Berryhill, *supra*,

"The extent to which an administrative agency may investigate and act upon material facts of a case and then, consistent with due process, sit as an adjudicative body to determine those facts finally has occasioned some divergence of views among federal courts . . ."

While it may be well established that such combination of functions in administrative agencies or boards does not per se violate due process, we must carefully scrutinize the facts in this case to determine if due process has been violated.

■ What constitutes due process within an administrative proceeding? While recognizing that the adjudicative function of the Board is quasi-judicial in nature, we have never held that the minimal due process that must be afforded participants before an administrative board or agency is synonymous with minimal requirements of due process in a court of law. To do so would be to create a second judicial branch without statutory authority and add to time required in the disposition of administrative decisions.

In Brinkley v. Hassig, 83 F.2d 351 (10 C.A.1936), a case in which the Kansas State Medical Board revoked the license of Dr. Brinkley to practice medicine and surgery in Kansas, the court stated it was established for the purposes of its decision in *Brinkley* because of prior State court litigation and a dismissal of an appeal to the United States Supreme Court involving an earlier appeal by Dr. Brinkley, that:

"(5) The board is not a judicial tribunal, and due process does not require a judicial trial, and the character of the hearing is not measured by standards of judicial procedure." 83 F.2d 351 at 356.

In In re Township 143 North, Range 55 West, Cass County, 183 N.W.2d 520 (N.D. 1971), an appeal from the State Board of Public School Education, an administrative board, wherein we considered the question of what constitutes an unfair, arbitrary, or discriminatory hearing before an administrative board, we concluded that there must be an absence of one of the elements deemed essential to due process of law without specifically enumerating what those essential elements are.

"To constitute an unfair, arbitrary or discriminatory hearing before an administrative agency, the defect or practice complained of must be such as might lead to a denial of justice or there must be an absence of one of the elements deemed essential to due process of law. An examination of the record on this appeal shows equal opportunity to present evidence, and that such evidence and applicable statutes to have been carefully considered by the administrative agency.

"Upon appeal to the Supreme Court from a judgment of the district court, entered on appeal from the decision of an administrative agency, the scope of appeal is limited. The decision of the agency must be affirmed unless the court finds that the decision of the agency is not in accordance with law, or that it is a violation of the constitutional rights of the appellant, or that any of the provisions of the Administrative Agencies Practice Act have not been complied with in the proceedings before the agency, or that the rules of procedure of the agency have not afforded the appellant a fair hearing, or that the findings of fact made by the agency are not supported by the evidence or that the conclusions and decision of the agency are not supported by its findings of fact. Section 28–32–18, N.D.C.C.; Application of Northern States Power Company, 171 N.W.2d 751 (N.D.1969); In re Superior Service Company, 94 N.W.2d 84 (N.D.1958)." In re Township 143 North, Range 55 West, Cass County, *supra*, 183 N.W.2d 520 at 534.

■ Here, the statute does not provide for the disqualification and temporary re-

placement of board members or for a substitute tribunal. When challenged, must a board member or the entire board refuse to act, leaving no substitute board and providing no forum for a hearing on the alleged violations of law? The courts have treated this question as presenting a comparison of wrongs or a choice of two evils. When confronted with this problem, the courts have relied upon the so-called "Rule of Necessity" to require otherwise disqualified officers to serve when no provision has been made for a substitute tribunal.

In reviewing the challenged lack of due process at the administrative hearing, due to bias, we begin with the presumption that the Board regularly performed its duty and accordingly afforded FAB and the depositors due process at the administrative hearing by refusing to allow any possible previous bias or prejudgment to interfere with its decision based upon evidence presented at the hearing.

"31-11-03. Disputable presumptions— All presumptions other than those set forth in section 31-11-02 are satisfactory if uncontradicted. They are denominated disputable presumptions and may be contradicted by other evidence. The following are of that kind:

\* \* \* \* \* \*

"15. That official duty has been performed regularly;" N.D.C.C.

Nevertheless, the Bank asserts it was denied a fair hearing in a multitude of ways. Rather than attempt to recite all the publicity and harassment that the Bank asserts prejudiced it, we refer to the prior litigation. It is our view that the facts, the statutes, and our prior decision left the Board with no alternative other than conducting a hearing to determine the issue of insolvency. See FAB v. Ellwein, *supra*. It would be anomalous, if not ridiculous, for this court to advise an administrative hearing and then tag the hearing with being void after it is held, unless there was an intervening circumstance, which we do not find.

The Rule of Necessity was early recognized by the United States Supreme Court in Evans v. Gore, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887, 11 A.L.R. 519 (1920). The case is no longer followed on the constitutional question of taxation decided therein, but it remains a useful and reliable guide in deciding cases which may call for the applicability of the Rule of Necessity. In *Evans,* a United States District Judge for the Western District of Kentucky as plaintiff sought a refund for taxes paid under protest. The question the Supreme Court was faced with was whether under the Constitution Congress has the power to tax the compensation of Federal Judges. In support of the Rule of Necessity, the court said:

"Because of the individual relation of the members of this court to the question, thus broadly stated, we cannot but regret that its solution falls to us; and this although each member has been paying the tax in respect of his salary voluntarily and in regular course. But jurisdiction of the present case cannot be declined or renounced. The plaintiff was entitled by law to invoke our decision on the question as respects his own compensation, in which no other judge can have any direct personal interest; and there was no other appellate tribunal to which under the law he could go. He brought the case here in due course, the Government joined him in asking an early determination of the question involved, and both have been heard at the bar and through printed briefs. In this situation, the only course open to us is to consider and decide the cause,—a conclusion supported by precedents reaching back many years. Moreover, it appears that, when this taxing provision was adopted, Congress regarded it as of uncertain constitutoinality and both contemplated and intended that the question should be settled by us in a case like this." Evans v. Gore, *supra,* 253 U.S. 245 at 247, 248, 40 S.Ct. 550 at 551.

Even though the judges were directly interested in the outcome, they were not dis-

qualified, for the reason that no other tribunal existed to hear the issue.

The Rule of Necessity is not confined to judicial proceedings, but is equally applicable to State administrative proceedings. In Brinkley v. Hassig, *supra*, Dr. Brinkley alleged that the revocation proceedings should be set aside because the medical board members were prejudiced against him and had been active in the bringing of the charges against him. The court agreed that in all probability all the board members were in fact prejudiced, but it refused to set aside the action of the board.

The Tenth Circuit Court of Appeals stated:

"If an administrative tribunal may on its own initiative investigate, file a complaint, and then try the charge so preferred, due process is not denied here because one or more members of the board aided in the investigation." Brinkley v. Hassig, supra, 83 F.2d 351 at 357.

The court concluded:

"Assuming such preconceived prejudice, what is the answer? The statute provides but one tribunal with power to revoke a doctor's license, just as the Supreme Court of Kansas is the only body with power to disbar a lawyer. If such powers may not be exercised if the members of the board or court are prejudiced, then any lawyer or doctor who commits an offense so grave that it shocks every right-thinking person, has an irrevocable license to practice his profession if he can get the news of his offense to the court or board before the trial begins. That will not do. The commendable efforts of the medical and legal professions to raise the standards of their professions by cleaning their own houses cannot be set at naught by any such rule of law.

"From the very necessity of the case has grown the rule that disqualification will not be permitted to destroy the only tribunal with power in the premises. If the law provides for a substitution of personnel on a board or court, or if another tribunal exists to which resort may be had, a disqualified member may not act. But where no such provision is made, the law cannot be nullified or the doors to justice barred because of prejudice or disqualification of a member of a court or an administrative tribunal." Brinkley v. Hassig, *supra*, 83 F.2d 351 at 357.

In The Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), it was expressly noted that in administrative proceedings, substitute tribunals rarely exist and that generalized attitudes in advance of a hearing are not necessarily regarded as constituting a disqualifying bias. The Cement Institute was a trade association whose members had been accused of restraining competition by agreeing to use a multiple-basing point system of pricing. The hearing lasted for over three years, producing 49,000 pages of oral testimony and 50,000 pages of exhibits. Before any decision was announced, the Commission was asked to disqualify itself on the basis of prejudgment, bias, and prejudice, because of reports the Commission had made to Congress, the President, and to various congressional committees, which evidenced the opinion that a multiple-basing point system was a price-fixing device which violated the Sherman Anti-Trust Act. Although the court assumed such opinions were formed because of prior official investigations, the court held that these generalized attitudes did not disqualify the Commission.

"In the first place, the fact that the Commission had entertained such views as the result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices. Here, in contrast to the Commission's investigations, members of the cement industry were legally authorized participants in the hearings. They produced evidence—volumes of it.

They were free to point out to the Commission by testimony, by cross-examination of witnesses, and by arguments, conditions of the trade practices under attack which they thought kept these practices within the range of legally permissible business activities.

"Moreover, Marquette's position, if sustained, would to a large extent defeat the congressional purposes which prompted passage of the Trade Commission Act. Had the entire membership of the Commission disqualified in the proceedings against these respondents, this complaint could not have been acted upon by the Commission or by any other government agency. Congress has provided for no such contingency. It has not directed that the Commission disqualify itself under any circumstances, has not provided for substitute commissioners should any of its members disqualify, and has not authorized any other government agency to hold hearings, make findings, and issue cease and desist orders in proceedings against unfair trade practices. Yet if Marquette is right, the Commission, by making studies and filing reports in obedience to congressional command, completely immunized the practices investigated, even though they are 'unfair,' from any cease and desist order by the Commission or any other governmental agency.

"There is no warrant in the Act for reaching a conclusion which would thus frustrate its purposes. * * *" Federal Trade Com. v. Cement Institute, *supra,* 333 U.S. at 701, 68 S.Ct. at 803, 92 L.Ed. 1010 at 1034, 1035.

Regarding the argument of a claimed denial of due process, the court said:

"Neither the Tumey decision nor any other decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law.

In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court." Federal Trade Com. v. Cement Institute, *supra,* 333 U.S. at 702, 68 S.Ct. at 804, 92 L.Ed. 1010 at 1035.

■ There are instances when the Rule of Necessity does not apply. E. g., State ex rel. Miller v. Aldridge, 212 Ala. 660, 103 So. 835, 39 A.L.R. 1470 (1925). Lack of due process, reaching constitutional gravity, does not yield to any "Rule of Necessity". The Rule of Necessity and the question of due process are really dissimilar concepts and should not be confused. A suspect person's sitting on a board does not, of itself, render the whole proceeding void for lack of due process. In this case, we are saying there is adequate due process and therefore the Rule of Necessity must prevail.

■ We earlier stated that the minimal due process that must be afforded participants before an administrative board is not synonymous with the minimal requirement of due process in a court of law. The fundamental requirement of due process is the opportunity to be heard. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). As the final body entrusted with the responsibility of making our Constitution a living force against heavy-handed administrative decision, we have proceeded in this case with great caution. Our trust must be in the integrity of legally constituted boards to act upon the evidence alone. Judicial review of those actions is the ultimate due process protection accorded those aggrieved. We can find no evidence that taints the hearing itself and as we have already said, we cannot consider extra-record allegations. Let us now review the results of that hearing.

■ There is no need to further burden this opinion with an itemization of

all the indicia of insolvency, fraud, and mismanagement. To do so would run the opinion into a hundred pages. We ask not so much whether we will reach the same decision on the same grounds as did the Board, but rather, was the decision arrived at properly and is it supported by substantial evidence? Both sides have accused the other of juggling figures. Witnesses, with varying portions of expertise, all testified that in their opinion the assets of FAB were insufficient to pay its liabilities. This Court has no power to substitute its own opinion for the judgment of qualified experts in matters entrusted to administrative agencies. See, FAB v. Ellwein, *supra*, at 106, with numerous other citations there referenced. The Examiner and his deputies have all had accounting training (most are Certified Public Accountants) and the Examiner, by statute, has the discretion to determine whether the particular instances of accounting practices conform to the law and sound banking usage. FAB's President, Mr. Hart, said he believed FAB's assets were sufficient to pay its liabilities. Leaving aside the question of Mr. Hart's qualifications to so testify, we are unconvinced that his testimony is acceptable on that score. While we do not accuse FAB of any creative accounting, we simply cannot accept such an opinion in the face of such overwhelming evidence to the contrary.

Let us detail some of the significant items of insolvency:

1. FAB had from 1963 to 1969 a net operating loss of $227,118.80; a loss of $16,270.36 in 1970 and $152,031.31 in 1971; as of December 31, 1971 the capital account was exhausted and there was a deficit of $42,870.47.

2. Contrary to generally acceptable principles of accounting, FAB consistently entered as earnings the gross amount to be received during the full term of a property lease in the year the lease was executed. Thus, the effect was overstating the income in the year the lease was executed.

3. "Capital Notes" sold were not approved by the State Examiner as required by law and they were sold to trusts of which FAB itself was trustee—a curious piece of self-dealing seemingly contrary to 6–05–15, N.D. C.C., and well recognized standards for the investment of trust funds. These notes were subordinate to the claim of depositors but this was not fully disclosed to the buyers. Subsequently, the note holders were informed of an opportunity to convert to a higher interest rate certificate but were not told they had to actually "borrow" the money by signing a note. (A note for their own money! The Mad Hatter would have liked this plan.)

4. There were suspect financial dealings between Mr. Hart and New Prince Hotel which was owned by him. Also, such dealings took place between FAB and Standard Investment Company, another Hart family enterprise. Standard showed a net profit of $15.49 in 1970. Yet an unsecured loan of $65,000.00 was made to it. Incidentally, nearly 20 percent of all loans and leases were made without adequate .security to Mr. Hart or his family enterprises.

5. Bismarck Investment Corporation, owned by Hart, had no operating statement but received a $54,000.00 loan which was classified by FAB as a loss.

6. A loan was made to Hart's son and his corporation although the income sources of the corporation were, if not non-existent, nebulous.

7. An unsecured loan was made to Mr. Campbell, a vice-president of FAB, for $12,129.98 *when he was bankrupt*. He then borrowed $19,500.00 from FAB at a later date to repay a loan made to him by Mr. Hart.

While our primary concern throughout the examination of the record has been with the question of insolvency, we must make a concluding comment about the overall operation of this banking institution. We believe that the powers and duties of the State Banking Board as defined in 6–01–04, N.D.C.C., allow for the enforcement of such orders as in its judgment may be necessary or proper to protect the public and the depositors of a financial institution. Continued operating losses, confusing and ridiculous letter exchanges between officers, unacceptable accounting practices to overstate income, excessive self-dealing between officers and their families, misleading, if not false, advertising on insurability of deposits, all lead to complete justification by the Board in closing down this operation. We have no evidence that the Board acted from malice, self-interest or any other improper motive. Our review, limited to the record, indicates there is substantial evidence to support the findings of fact made by the Banking Board. Suedel v. North Dakota Workmen's Compensation Bureau, 218 N.W.2d 164 (N.D.1974); In re Township 143 North, Range 55 West, Cass County, *supra;* Williams Electric v. Montana-Dakota Utilities Co., 79 N.W.2d 508 (N.D.1956). Accordingly, the order of the Board appointing a receiver to liquidate the bank is affirmed and the judgment of the District Court is reversed, and the District Court is directed to enter judgment on remand affirming the order of the State Banking Board.

ERICKSTAD, C. J., and TUGEN, J., concur.

HARVEY B. KNUDSON, WM. L. PAULSON and ROBERT VOGEL, JJ., deeming themselves disqualified did not participate; C. F. KELSCH and EMIL A. GIESE, District Judges of the Sixth Judicial District and JAMES H. O'KEEFE, District Judge of the Second Judicial District, sitting in place of the disqualified justices.

EMIL A. GIESE, District Judge (concurring specially).

I concur in Judge Kelsch's concurrence, with the understanding that paragraph numbered 3, page 4, is intended to mean that the Board would render an opinion relative to complaints initiated and findings made by the State Examiner, only after due hearing on the merits.

C. F. KELSCH, District Judge (concurring specially).

I concur in the opinion of the court, with one important exception. I do not agree with the inference or implied conclusion that the State Banking Board, as now established under our statute, constitutes a fair and impartial administrative tribunal before which any financial institution under its jurisdiction can have a fair and impartial hearing; from which I dissent and desire to state my reasons therefor.

It is well settled in this State:

(1) That where the constitutionality of a statute depends upon the power of the legislature to enact it, its validity must be tested by what might be done under color of the law and not what has been done.

Herr v. Rudolf, 75 N.D. 91, 25 N.W.2d 916

(2) That this court has no power to declare any legislative enactment or law of this State unconstitutional, unless at least four of the Judges decide that its invalidity is clear beyond a reasonable doubt.

Section 89 of the State Constitution;

State ex rel Mason v. Baker, 69 N.D. 488, 288 N.W. 202

An analysis of out banking laws, in so far as they relate to a determination of the insolvency of any financial institution under its jurisdiction, discloses that they not only authorize but expressly require:

(1) That the state examiner, while acting in a purely administrative capacity, must find and determine whether the fi-

nancial institution which he has examined is, in fact, insolvent;

(2) That the State Banking Board, while acting in a purely administrative capacity, must approve or disapprove the examiner's findings that the bank which he has examined is, in fact, insolvent; and

(3) That the state examiner and the State Banking Board, while acting in a quasi-judicial capacity, must sit in judgment to review and pass upon the necessity, reasonableness or validity of its prior decision that the financial institution involved was, in fact, insolvent.

I am firmly convinced:

(1) That the legislative scheme which unites investigative authority, accusatory and adjudicatory functions, in one administrative agency is unsound in principle, unwise in public policy, inconsistent with common experience and violative of the fundamental requirement of due process of law, as established by the recent decisions of the Supreme Court of the United States.

In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942;

Kinsella v. United States, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268;

Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287;

Morrisey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed. 484;

Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488

(2) That where the state examiner and the other members of the State Banking Board are required by statute, while acting in a purely administrative capacity, to determine whether the financial institution in issue is, in fact, insolvent, that in such case it is reasonable to find and conclude that each member has a vital, personal interest in the outcome of the proceeding before the board, while it is acting in a quasi-judicial capacity; and consequently it is unreasonable and inconsistent with common experience to believe and to find that any member would admit that he made a mistake, that he acted arbitrarily or in bad faith in breach of his official duties. On the contrary, their self-interest would actuate and persuade them to use and exercise all of the power and influence of their official position to defend and justify their prior decision that the bank in issue was, in fact, insolvent.

(3) That where the members of an administrative agency are required to prejudge the issue which they are to 'try upon the merits, they cannot, by reason of their bias and prejudice, act as independent or impartial decision makers;

Goldberg and Morrisey, supra

That such legislative policy is, in my judgment, not only repugnant to and inconsistent with but also offends the principle of fundamental fairness essential to constitute due process of law.

Kinsella, supra

While courts have no power to legislate by judicial fiat, (Shermoen v. Lindsay, N.D. 163 N.W.2d 738) I firmly believe I have the right and the explicit duty to recommend the enactment of timely, remedial legislation, so as to provide, in effect:

(1) That the state examiner be removed as a member and chairman of the State Banking Board, so that he will have no authority to act in a quasi-judicial capacity.

(2) That the State Banking Board be relieved and absolved from the duty and responsibility of approving or disapproving the state examiner's findings that any bank under its jurisdiction, which he has examined, is insolvent, while acting in a purely administrative capacity, so that the board will not have to sit in judgment of and be required to pass upon the necessity, reasonableness or validity of its prior decision by approving the state examiner's report.

(3) That the board should not only have the right but the clear legal duty to review the state examiner's findings on insolvency and to either approve or reject the same, if the clear weight of the evidence before it justifies such a determination.

I firmly believe that the enactment of such remedial legislation:

(1) Would remove the serious doubt, which now exists, as to the constitutional validity of our statutes; and whether the State Banking Board, as now established, constitutes a fair and impartial administrative tribunal before which a fair and impartial hearing can be had by any financial institution under its jurisdiction;

(2) Would protect every financial institution in this State from the unreasonable, arbitrary or oppressive action of the state examiner;

(3) Would protect both the public and private interests in the financial institutions of this State in case of an emergency;

(4) Would protect and safeguard the right of all financial institutions in this State to the constitutional guarantee of due process of law; and

(5) Would put an end to the protracted, highly expensive, needless and unjust litigation that has been before this court in this controversy between these parties; and thereby make a substantial contribution to the improvement of administrative justice in this State.