In the Matter of The Application for PERMITS TO DRAIN RELATED TO STONE CREEK CHANNEL IMPROVEMENTS AND WHITE SPUR DRAIN.

BOTTINEAU COUNTY WATER RESOURCE DISTRICT and State Engineer, Appellants,

v.

NORTH DAKOTA WILDLIFE SOCIETY, Appellee.

Civ. No. 870247.

Supreme Court of North Dakota.

May 16, 1988.

Zuger, Kirmis, Bolinske & Smith, Bismarck, for appellant Bottineau County Water Resource Dist.; argued by Murray G. Sagsveen, Bismarck.

Rosellen M. Sand (argued), Water Com'n, Bismarck, for appellant State Engineer.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for appellee; argued by Joseph J. Cichy, Bismarck.

MESCHKE, Justice.

The Board of Managers of the Bottineau County Water Resource District and the North Dakota State Engineer appealed from a district court judgment reversing the State Engineer's decision which approved the Board's application for the White Spur Drain. We reverse the judgment of the district court and affirm the decision of the State Engineer.

In October 1979 the Board submitted two drainage applications to the State Engineer for improvements to Stone Creek Channel and for the proposed White Spur Drain, both located in south central Bottineau County. The State Engineer determined the applications were of statewide significance and returned them to the Board for further proceedings. In July 1981 the Board decided to begin action on the Stone Creek/White Spur Project [Project].

Stone Creek is a tributary of the Souris River. The purpose of the Stone Creek Channel improvement is to reduce flood

damage along a portion of Stone Creek and to enable Stone Creek to handle additional flows expected from the White Spur Drain. The purpose of the White Spur Drain is to provide drainage for several hundred acres of low-lying farmland that flood during heavy spring runoffs. Flood waters, together with overflow from the Oak Creek watershed, become trapped in the White Spur area causing damage to township and county roads as well as loss of farmland. The White Spur drainage covers close to 14 square miles.

The Board and the Oak Creek Water Resource District agreed that the Board was authorized to place part of the Project's assessment area in the Oak Creek District. The Board held a hearing on the applications in April 1983 and, in June 1983, ordered that the drain be established. The Board also retained a professional engineer to make a hydraulic analysis and conduct the necessary investigation for the drainage permit applications. A supplemental hearing on the applications was conducted by the Board in April 1986 and, on April 21, 1986, the Board ordered that the permits to drain be approved. The applications were sent to the State Engineer for further consideration.

The State Engineer held a hearing in May 1986 and, in an order on August 25, 1986, approved the drainage permits subject to various conditions. The Project had originally included 18 type IV wetlands, but the State Engineer prohibited drainage of three of them. Of the 15 remaining type IV wetlands, five were determined to lie along the only reasonably available path for the proposed drain and were allowed to be drained in order for the Project to proceed. Ten were found to cover "prime farmland" and were allowed to be drained to put the land into consistent production.

Four of the type IV wetlands along the path of the drain were also determined to be underlain with "prime farmland."

The North Dakota Wildlife Society, which had opposed the project at the hearing, appealed the State Engineer's decision to the district court.[1] The Society attacked approval of the drainage permit for White Spur Drain but did not challenge approval of the Stone Creek Channel improvements. The district court concluded that: 1) the State Engineer improperly placed the burden of proof about water quality on Project opponents and failed to make findings of fact regarding the Project's impact on water quality; 2) there was insufficient evidence to support findings of "overriding circumstances" to allow drainage of type IV wetlands; and 3) the State Engineer made no findings about the Project's effect on fish and wildlife values in type I and III wetlands. For those reasons, the district court reversed the decision of the State Engineer and remanded for further proceedings. The Board and the State Engineer appealed.

Our review is governed by § 28–32–19, N.D.C.C., which requires us to affirm an administrative decision: 1) if the findings of fact are supported by a preponderance of the evidence; 2) if the conclusions of law are sustained by the findings of fact; 3) if the agency decision is supported by the conclusions of law; and 4) if the decision is in accordance with the law. *S. W. v. N. D. Dept. of Human Services,* 420 N.W.2d 344, 345 (N.D.1988).

## WATER QUALITY

Section 61–16.1–41, N.D.C.C., the statute in effect at the time of these proceedings,[2] directed:

> *"Permit to drain waters required— Penalty.* Any person, before draining water from a pond, slough, or lake, or

---

**1.** The Board asserted that the Society did not have standing to appeal the State Engineer's decision because the Society had not established that it was "factually aggrieved" by that decision. *See Washburn Public School District No. 4 v. State Board of Public School Education,* 338 N.W.2d 664 (N.D.1983). The district court determined that the Society was "aggrieved and

has standing to appeal the decision." Because we reverse the district court judgment and uphold the State Engineer's decision, we do not address this standing issue.

**2.** Section 61–16.1–41, N.D.C.C., was repealed in 1987 when the Legislature enacted Chapter 61–32, N.D.C.C. *See* 1987 N.D.Sess.Laws Ch. 642,

any series thereof, which drains an area comprising eighty acres [32.37 hectares] or more, shall first secure a permit to do so. The permit application shall be submitted to the state engineer. The state engineer shall refer the application to the water resource district or districts within which is found a majority of the watershed or drainage area of the pond, slough, or lake for consideration and approval, but the state engineer may require that applications proposing drainage of statewide or interdistrict signifi-

cance be returned to him for final approval. A permit shall not be granted until an investigation discloses that the quantity of water which will be drained from the pond, slough, or lake, or any series thereof, will not flood or adversely affect downstream lands. In addition, consideration shall be given to the state water resources policy set forth in section 61–01–26...." [3]

In implementing §§ 61–16.1–41 and 61–01–26, N.D.C.C., the State Engineer prom-

§ 13. Section 61–32–01, N.D.C.C., declares the Legislature's current wetlands policy:

*"Legislative policy and intent.*

\* \* \* \* \* \*

"In view of the legislative findings and conclusions of the importance of wetlands, water development and management, and agriculture in North Dakota, it is hereby declared to be the wetlands policy of this state that:

"1. Water development and wetland preservation activities should be balanced to protect and accommodate agriculture, water, and wetland interests and objectives.

"2. Programs protecting and preserving wetlands shall provide adequate compensation to the landowner and must provide periodic reevaluation of compensation to the landowner. Annual payments are encouraged as an option for landowners.

"3. Land, wetland, or water acquisition for waterfowl production areas, wildlife refuges, or other wildlife, waterfowl, or wetland protection purposes may not be acquired through the exercise of the right of eminent domain.

"4. When land is removed from the tax base to protect wetlands, replacement payments must be made by the entity which purchases the land so that the amount of money that would otherwise be received in taxes if such land was not removed from the tax base is not diminished."

Under the new law, permits for wetland drainage are governed by § 61–32–03, N.D.C.C. In addition to the requirements carried over from § 61–16.1–41, N.D.C.C., § 61–32–03 further provides that before a drainage permit can be approved the State Engineer and the State Game and Fish Commissioner must jointly find that the wetland acres to be drained by the proposed project will be replaced by an equal acreage of replacement wetlands, or through debits in the wetland bank established in § 61–32–05, N.D.C.C. The replacement of wetlands requirements, however, do not take effect until July 1, 1989. *See* 1987 N.D.Sess.Laws Ch. 642, § 14.

**3.** Section 61–01–26, N.D.C.C., prescribes state water resources policy:

*"Declaration of state water resources policy.* In view of legislative findings and determination of the ever-increasing demand and anticipated future need for water in North Dakota for every beneficial purpose and use, it is hereby declared to be the water resources policy of the state that:

"1. The public health, safety and general welfare, including without limitation, enhancement of opportunities for social and economic growth and expansion, of all of the people of the state, depend in large measure upon the optimum protection, management, and wise utilization of all of the water and related land resources of the state.

"2. Well-being of all of the people of the state shall be the overriding determinant in considering the best use, or combination of uses, of water and related land resources.

"3. Storage of the maximum water supplies shall be provided wherever and whenever deemed feasible and practicable.

"4. Accruing benefits from these resources can best be achieved for the people of the state through the development, execution, and periodic updating of comprehensive, coordinated, and well-balanced short-term and long-term plans and programs for the conservation and development of such resources by the departments and agencies of the state having responsibilities therefor.

"5. Adequate implementation of such plans and programs shall be provided by the state through cost-sharing and cooperative participation with the appropriate federal and state departments and agencies and political subdivisions within the limitation of budgetary requirements and administrative capabilities.

"6. Required assurances of state cooperation and for meeting nonfederal repayment obligations of the state in connection with federal-assisted state projects shall be provided by the appropriate state department or agency.

"7. Required assurances of local cooperation and for meeting nonfederal repayment obligations of local interests in connection with federal-assisted local projects may, at the request of political subdivisions or other local

ulgated § 89–02–01–16, N.D.Adm.Code,[4] which designates criteria for evaluating a drainage permit application. Among the criteria is "[w]hether it is shown that there will be a significant decrease in water quality resulting from the proposed drainage project." Section 89–02–01–16(4)(a), N.D. Adm.Code. The district court ruled that the State Engineer improperly placed the burden of proof upon opponents of the Project to show that a significant decrease in water quality would result from the proposed drainage project.[5]

■ There are two components of the burden of proof: 1) the burden of going forward with proof, and 2) the burden of persuasion. *See Sunderland v. N.D. Workmen's Comp. Bureau,* 370 N.W.2d 549, 552 (N.D. 1985). We have recognized that the moving party generally has the burden of proof in an administrative proceeding. *See Kobilansky v. Liffrig,* 358 N.W.2d 781, 790 (N.D. 1984). This generally means that, in the absence of an operative presumption, the moving party has the burden of going forward as well as the burden of persuasion in an administrative hearing. *See, e.g., Gourley v. Board of Trustees of S. Dakota,* 289 N.W.2d 251, 253 (S.D. 1980). In this case, the proponent of the project, *i.e.,* the Board, is obviously the moving party.

On the burden of proof, the State Engineer recited in his decision:

"Generally, it is the applicant for a drainage permit that has the burden to produce evidence and persuade the State Engineer that the permit should be granted. There is an exception to this rule. Section 89–02–01–[16] contains the factors the State Engineer is to consider.

interests be provided by the appropriate state department or agency, provided, if for any reason it is deemed necessary by any department or agency of the state to expend state funds in order to fulfill any obligation of a political subdivision or other local interests in connection with the construction, operation, or maintenance of any such project, the state shall have and may enforce a claim against the political subdivision or other local interests for such expenditures.

"The provisions of this chapter shall not be construed to in any manner limit, impair, or abrogate the rights, powers, duties, or functions of any department or agency of the state having jurisdiction or responsibilities in the field of water and related land resources conservation, development, or utilization."

4. Section 89–02–01–16, N.D.Adm.Code, states:

"*Consideration by the state engineer and districts.* In evaluating a drainage permit application the state engineer and districts shall consider the following criteria:

"1. Whether the flow or quantity of water to be drained will overburden the watercourse into which the water will be drained.

"2. Whether the drainage will flood or adversely affect the lands of lower proprietors.

"3. Whether easements are required.

"4. Whether consideration was given to the water resources policy as contained in North Dakota Century Code section 61–01–26, including the following:

"a. Whether it is shown that there will be a significant decrease in water quality resulting from the proposed drainage project.

"b. Whether, in evaluating the entire watershed, the resultant drainage will signifi-

cantly increase flooding problems in the watershed.

"c. Whether the permanent storage of water on parcels in the application area is beneficial.

"d. Whether the area's erosion potential will be increased significantly due to the drainage of the water and the subsequent lack of wetlands to retard erosion.

"e. Whether type four and five wetlands as determined by the state engineer from evidence in the record exist in the application area, and if so, those wetlands shall not be drained unless overriding circumstances exist.

"f. Whether the agricultural productivity was considered.

"g. Whether the drainage project will decrease local flooding problems.

"h. Whether fish and wildlife values were considered.

"5. Any other factors deemed important."

5. The Board asserted that the district court erred because, under pertinent statutes, the State Engineer had no authority to deny an application for reasons unrelated to quantitative downstream impacts. Thus, the Board contended, even if the State Engineer had determined under § 89–02–01–16, N.D.Adm.Code, that the Project would cause a significant decrease in water quality or would adversely affect wildlife habitat, the application could not have been denied solely for those reasons. Because the State Engineer made no such determinations, and in view of our disposition of this case, we decline to address this issue.

Of these, paragraph 4(a) is worded differently than the others. It says: 'Whether it is shown that there will be a significant decrease in water quality resulting from the proposed drainage project.'

"This means a project opponent has the burden of coming forward with evidence that a significant decrease in water quality is likely. A prima facie case of adverse consequences must be made out. If this is done, the applicant must respond and carry the burden of ultimate persuasion that a significant decrease in water quality will not occur."

■ Regardless of whether the State Engineer properly placed the beginning burden of going forward with evidence on project opponents, we see that both opponents and proponents submitted evidence about the effect of the Project on water quality. Importantly, the State Engineer did not place the ultimate burden of persuasion upon opponents, but placed it upon the proponents and, after evaluating conflicting evidence, determined that the Project "will not cause a significant decrease in water quality." We therefore do not view the State Engineer's analysis of the burden of proof as a fatal procedural error.

■ The district court also ruled that the State Engineer's "conclusion" that the Project will not cause a significant decrease in water quality was not supported by any findings. Whether a particular pronouncement is a finding of fact or a conclusion of law will be determined by the reviewing court, and labels are not conclusive. *Geiger v. Hjelle*, 396 N.W.2d 302 (N.D. 1986). Clearly, the State Engineer's "conclusion" about the Project's impact on water quality was a finding of fact, and it was amply supported by evidence.

Two reports by Jon Malcolm of the U.S. Fish and Wildlife Service, based upon studies conducted during 1978 and 1979, said that wetland drainage in the area would cause a decrease in overall water quality.

This evidence was refuted by a report from State Conservationist J. Michael Nethery of the U.S. Department of Agriculture Soil Conservation Service who made a detailed study of the reports. The State Engineer found that Nethery's "analysis is sufficient to cast considerable doubt upon Malcolm's conclusions" and that "[o]f all the evidence submitted, Nethery's report may be the most trustworthy for he has the least interest in the outcome of this decision." There was also evidence that any decrease in water quality does not continue for more than a few years after the beginning of wetland drainage and the State Engineer determined that several features of the Project would protect against undue degradation of water quality during this time. Ameliorating features included the relatively flat channel gradient of the drain, control gates and a temporary pond for settlement of sediment, and grassed channels along the improvements to Stone Creek and within the White Spur watershed.

"Where the subject matter is of a technical nature, the expertise of the administrative agency is entitled to respect." *Triangle Oilfield Services, Inc. v. Hagen*, 373 N.W.2d 413, 415 (N.D. 1985). We believe that the greater weight of the evidence showed that the Project would not cause a significant decrease in water quality.

## OVERRIDING CIRCUMSTANCES

A type IV wetland is defined in the administrative regulations as a "pond," meaning "a land depression where the soil is covered with six inches [15 centimeters] to three feet [0.91 meters] or more of water throughout the growing season." Section 89-02-01-02(10), N.D.Adm.Code. Section 89-02-01-16(4)(e), N.D.Adm.Code, prohibits drainage of type IV wetlands "unless overriding circumstances exist." The State Engineer found that "overriding circumstances" existed to justify the drainage of 15 type IV wetlands. The State Engineer determined that one "overriding circumstance" was that 5 of them were along the only reasonably available route for the

White Spur Drain. The "overriding circumstance" for drainage of the other 10 was that the soil underneath them is "prime farmland." The district court rejected the State Engineer's determination of "overriding circumstances" as "contrary to law."

■ While an administrative agency is certainly bound by its own duly issued regulations [see *Fercho v. Montpelier Pub. Sch. Dist. No. 14*, 312 N.W.2d 337, 341 (N.D. 1981) ], an agency nevertheless has a reasonable range of informed discretion in the interpretation and application of its own rules. *See Quarles v. McKenzie Public School District No. 34*, 325 N.W.2d 662, 670 (N.D. 1982); *Dameron v. Neumann Bros., Inc.*, 339 N.W.2d 160, 162 (Iowa 1983); 2 Am.Jur.2d *Administrative Law* § 349 (1962). Thus, courts generally defer to an agency's reasonable interpretation when the language is so technical that only a specialized agency has the experience and expertise to understand it or when the language is ambiguous. *See Resident v. Noot*, 305 N.W.2d 311, 312 (Minn. 1981). No deference is called for when the regulating language is clear.

■ We cannot say that the State Engineer's interpretation of "overriding circumstances" was contrary to law. The term is broad, if not ambiguous. Thus, the State Engineer was entitled to a reasonable range of discretion in interpreting and applying the rule.

The State Engineer determined that the Project would not be effective unless the drain traveled along 5 type IV wetlands. Although installation of sills to preserve these wetlands was considered, the State Engineer determined the area was too flat and the sills would cause more flooding than presently existed. The State Engineer found that prohibiting these wetlands from being drained would prevent the entire watershed from benefiting from the drainage project. We believe the State Engineer could reasonably find that this constituted overriding circumstances.

We also find nothing illogical in the State Engineer's determination that overriding circumstances exist because 10 of the wetlands are underlain by "prime farmland." Reclamation of farmland is not the sole purpose of the White Spur Drain. It is also intended to alleviate damage to roads from flooding. Moreover, "prime farmland" is not merely a grandiose cliché for any kind of land suitable for farming, but is a distinct category of soils defined by the U.S. Department of Agriculture.[6] "Prime farmland soils produce the highest yields with minimal inputs of energy and economic resources, and farming these soils results in the least damage to the environment." *Soil survey of Bottineau County North Dakota*, United States Department of Agriculture Soil Conservation Service, at p. 49 (Issued May 1982). The State Engineer recognized that these type IV wetlands were classified as prime farmland and that they could be drained without harm to downstream landowners. Agricultural productivity is important in implementing water resource policy. Section

---

6. "Prime farmland is one of several kinds of important farmland defined by the U.S. Department of Agriculture. It is of major importance in providing the nation's short- and long-range needs for food and fiber. The acreage of high-quality farmland is limited, and the U.S. Department of Agriculture recognizes that government at local, state, and federal levels, as well as individuals, must encourage and facilitate the wise use of our nation's prime farmland.

"Prime farmland soils, as defined by the U.S. Department of Agriculture, are soils that are best suited to producing food, feed, forage, fiber, and oilseed crops. Such soils have soil properties that are favorable for the eco-

nomic production of sustained high yields of crops. The soils need only to be treated and managed using acceptable farming methods. The moisture supply, of course, must be adequate, and the growing season has to be sufficiently long. Prime farmland soils produce the highest yields with minimal inputs of energy and economic resources, and farming these soils results in the least damage to the environment."

*Soil survey of Bottineau County North Dakota*, United States Department of Agriculture Soil Conservation Service, at p. 49 (Issued May 1982).

89–02–01–16(4)(f), N.D.Adm.Code. Furthermore, the State Engineer, by keeping intact some type IV wetlands in the drainage area, did take steps to protect wildlife and recreational values. Balancing the competing interests, the State Engineer found overriding circumstances to allow drainage. We are not convinced of any error in this determination.

## FISH AND WILDLIFE VALUES

■ Section 89–02–01–16(4)(h), N.D. Adm.Code, says that the State Engineer must consider "fish and wildlife values" when evaluating wetlands in a drainage project. Although the State Engineer stated in his decision that he had "considered how fish and wildlife values will be affected by the project" and discussed the evidence presented on the matter, the district court ruled that because there were no findings specifically related to type I and III wetlands, reversal was required.

Under the circumstances of this case, we do not believe the State Engineer was required to make separate findings regarding each distinct category of wetlands and the resultant effect of their drainage on fish and wildlife values. The State Engineer found that there "are many wetlands in the White Spur assessment area" in addition to type IV wetlands. The State Engineer further determined that "harm to wildlife and consequently, recreation, will be small." It is therefore apparent that the State Engineer sufficiently considered how the Project would affect fish and wildlife values.

## CUMULATIVE IMPACTS

■ The State Engineer determined that the Project "will not flood or adversely affect the lands of lower proprietors...." The Society contends that the State Engineer's decision must be reversed because he "failed to address the cumulative impact of wetland drainage in the Souris River Basin." The gist of the Society's argument is that the State Engineer's analysis of downstream impacts of the Project is skewed because he did not consider the possibility of other projects which may be developed in the future. The Society urges that the permit application be remanded so that the State Engineer can comprehensively study and evaluate the effect of this project together with other possible future projects on the lower Souris River. The district court rejected this argument and so do we.

Neither the statutes nor the regulations specify that the State Engineer consider the cumulative impact of the current project and possible future projects. Requiring the State Engineer to study and evaluate all possible contingencies, however remote, does not seem feasible or practical. See generally Davison v. Department of Defense, 560 F.Supp. 1019, 1025 (S.D. Ohio 1982); Gloucester County Concerned Citizens v. Goldschmidt, 533 F.Supp. 1222, 1229 (D.N.J. 1982); and Conservation Council of North Carolina v. Froehlke, 435 F.Supp. 775, 791 (M.D.N.C. 1977), construing requirements for Environmental Impact Statements under the National Environmental Policy Act. The State Engineer needed to evaluate the impacts of this project. He did so. Absent a statutory or regulatory specification, we decline to make the State Engineer consider cumulative impacts of future projects in drainage proceedings.

## FAIR HEARING

■ The Society also asserted that the State Engineer's decision-making process violated its constitutional due process rights. The Society contended that the State Engineer's relationship with water resource boards, the State Engineer's deviation from the hearing officer's recommendation, and the "tone and tenor" of the cross examination of witnesses by the State Engineer's legal counsel during the hearing revealed a bias against drainage opponents which precluded fair and impartial consideration of the drainage applications.

In *Meadow Fresh Farms, Inc. v. Sandstrom*, 333 N.W.2d 780, 784 (N.D. 1983), we said:

"A person is not denied due process of law or a fair administrative hearing merely because an administrative agency performs all three functions of investigation, prosecution, and adjudication. *See, First American Bank and Trust Company v. Ellwein*, 221 N.W.2d 509 (N.D. 1974), *cert. denied*, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974), *reh'g denied*, 419 U.S. 1117, 95 S.Ct. 798, 42 L.Ed.2d 816 (1975). Regarding the due process to which a person is entitled in administrative proceedings, we stated in *Ellwein, supra:*

" '[T]he minimal due process that must be afforded participants before an administrative board is not synonymous with the minimal requirement of due process in a court of law. The fundamental requirement of due process is the opportunity to be heard.... Our trust must be in the integrity of legally constituted boards to act upon the evidence alone. Judicial review of those actions is the ultimate due process protection accorded those aggrieved.' 221 N.W.2d at 517."

The Society's constitutional rights to a fair hearing were not disregarded merely because the State Engineer performed differing functions during the course of the drainage application process. *See Mattheis v. City of Hazen*, 421 N.W.2d 476 (N.D. 1988).

We also reject the Society's argument that the State Engineer's refusal to completely adopt the hearing officer's recommendation indicates an inherent bias against drainage opponents. An administrative agency is not compelled to adopt every recommendation of its hearing officer. In *Schultz v. North Dakota Dept. of Human Services*, 372 N.W.2d 888, 892 (N.D.1985), we said:

"The administrative officer deciding a case need not actually hear the witnesses testify or hear oral argument, but the officer deciding the case must consider and appraise the evidence before reaching a decision. *Morgan v. United States*, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); 3 Davis, Administrative Law, § 17:2 (2d Ed. 1980). Although a hearing examiner has the advantage of hearing and seeing witnesses testify, an agency may reject the examiner's decision even on a question involving the credibility of contradictory witnesses. 3 Davis, Administrative Law, § 17:16. A court's review of an agency decision does not include probing an agency decisionmaker's mental process if a hearing was given as required by law. *Morgan v. United States*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); 3 Davis, Administrative Law, § 17:16; Annot., 18 A.L.R. 2d 606, 623 (1951)."

A hearing was held as required by law. The State Engineer's decision showed that he considered the record as well as the hearing officer's recommendation. The State Engineer's decision also gave fair reasons for his deviation from the hearing officer's recommendation. *Medcenter One v. Job Service N.D.*, 410 N.W.2d 521, 524 (N.D.1987). The circumstances do not establish that the State Engineer was biased.

The Society further claimed that during the hearing the State Engineer's legal counsel "bent over backwards to discredit project opponents" and that "[h]er posture throughout the hearing provides a clear indication of bias...." Having reviewed the record and examined the manner of counsel's questioning, we find nothing which amounted to a denial of the Society's right to a fair hearing. *Schadler v. Job Service North Dakota*, 361 N.W.2d 254, 258 (N.D.1985).

## PUBLIC TRUST DOCTRINE

■ The Society contended that the State Engineer shirked his responsibilities under the public trust doctrine by granting the drainage permit for the White Spur Drain. *See generally J.P. Furlong Enterprises, Inc. v. Sun Exploration and Production Company*, 423 N.W.2d 130 (N.D.

---

1988); and *United Plainsmen v. N.D. State Water Conservation Commission*, 247 N.W.2d 457 (N.D.1976). Assuming only for purposes of argument that the public trust doctrine applies to drainage of wetlands on privately-owned lands [*see* J. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich.L.Rev. 471, 556–557 (1970)], the doctrine is intended to only require "controlled development of resources rather than no development." *United Plainsmen, supra*, 247 N.W.2d at 463 [quoting *Payne v. Kassab*, 11 Pa. Cmwlth. 14, 312 A.2d 86, 94 (1973)].

We see no violation of public trust responsibilities by the State Engineer in this case. The permits for and possible consequences of the Stone Creek Channel improvements and the White Spur Drain have been studied and debated by opponents and proponents for nearly a decade. The State Engineer's decision contained a detailed analysis of the evidence, discussed the potential impacts of the Project, and concluded that the drain should be permitted subject to various conditions. Some wetlands in the drainage area must be retained at their natural level while others may be drained, and the "project and operation plan are subject to future modifications or conditions by the State Engineer to protect the public interest."

### CONCLUSION

We conclude that the State Engineer's findings of fact were supported by a preponderance of the evidence, that his conclusions of law were sustained by the findings of fact, and that his decision was supported by the conclusions of law. His decision was in accordance with law. Accordingly, the district court judgment is reversed and the decision of the State Engineer is affirmed.

ERICKSTAD, C.J., and VANDE WALLE and GIERKE, JJ., concur.

LEVINE, J., concurs in the result.